1  Mark E. Merin (State Bar No. 043849)
   Paul H. Masuhara (State Bar No. 289805)
2  LAW OFFICE OF MARK E. MERIN
3  1010 F Street, Suite 300
   Sacramento, California 95814
4  Telephone:    (916) 443-6911
   Facsimile:    (916) 447-8336
5  E-Mail:       mark@markmerin.com
                 paul@markmerin.com
6
7  Attorneys for Plaintiff
   OURANIA THIMMHARDY

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10                 SACRAMENTO DIVISION

11 | OURANIA THIMMHARDY,                    | Case No.

12 |              Plaintiff,                | **COMPLAINT FOR VIOLATIONS OF**
                                            **CIVIL AND CONSTITUTIONAL RIGHTS**
13 | vs.

14 | COUNTY OF SACRAMENTO, SACRAMENTO       | **DEMAND FOR JURY TRIAL**
   | COUNTY SHERIFF'S DEPARTMENT,
15 | JIM COOPER, MATTHEW GURICH,
   | DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5,
16
17 |              Defendants.

18

19

20               **INTRODUCTION**

21         This case arises from the October 7, 2024, officer-involved assault of 71-year-old OURANIA

22 THIMMHARDY by deputy sheriffs, including MATTHEW GURICH, employed by the COUNTY OF

23 SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and Sheriff JIM COOPER.

24               **JURISDICTION & VENUE**

25         1.    This Court has original jurisdiction of the federal claims under 28 U.S.C. § 1331 (in that

26 they arise under the United States Constitution) and § 1343(a)(3) (in that the action is brought to address

27 deprivations, under color of state authority, of rights, privileges, and immunities secured by the United

28 States Constitution). This Court has supplemental jurisdiction of the state claims under 28 U.S.C. § 1367.

                                    1

2.    Venue is proper in the United State District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Eastern District of California and because many of the acts and/or omissions described herein occurred in the Eastern District of California.

3.    Intradistrict venue is proper in the Sacramento Division of the Eastern District of California pursuant to Eastern District of California Local Rule 120(d) because the claims asserted herein arise from acts and/or omissions which occurred in the County of Sacramento, California.

## EXHAUSTION

4.    On March 6, 2025, OURANIA THIMMHARDY submitted a government claim to the COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT relating to the claims asserted in this action. Claim No. L2400839.

5.    By April 21, 2025, the COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT failed or refused to act on the government claim.

## PARTIES

6.    Plaintiff OURANIA THIMMHARDY is a resident of the County of Sacramento, California.

7.    Defendant COUNTY OF SACRAMENTO is located in the State of California. Defendant COUNTY OF SACRAMENTO is a "public entity" pursuant to California Government Code § 811.2.

8.    Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT is located in the County of Sacramento, California. Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT is a "public entity" pursuant to California Government Code § 811.2.

9.    Defendant JIM COOPER is and was, at all times material herein, a law enforcement officer and the Sheriff for Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, acting within the scope of employment and under color of state law. Defendant JIM COOPER is sued in an individual capacity.

10.    Defendant MATTHEW GURICH was, at all times material herein, a law enforcement officer employed by Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, acting within the scope of employment and under color of state law. Defendant MATTHEW GURICH is sued in an individual capacity.

2

11.     Defendants DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5  are and/or were agents, contractors, or employees of Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, acting within the scope of agency or employment and under color of state law. Defendants DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 are sued by fictitious names and their true and correct names and identities will be substituted when ascertained.

## GENERAL ALLEGATIONS

12.     At all times relevant herein, all wrongful acts described were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

### Ourania Thimmhardy

13.     During the times relevant herein, Plaintiff OURANIA THIMMHARDY was a 71-year-old woman.

14.     Plaintiff OURANIA THIMMHARDY suffered from several diagnosed disabilities, including schizoaffective, bipolar, paranoia, and delusion disorders.

15.     Plaintiff OURANIA THIMMHARDY's disabilities substantially limited one or more major life activities, including the ability to care for one's self, concentrate, think, and communicate.

16.     Plaintiff OURANIA THIMMHARDY was hospitalization and received treatment for her disabilities on several occasions, including involuntary psychiatric commitment in mental health facilities. Plaintiff OURANIA THIMMHARDY was prescribed medications for her disabilities.

17.     Plaintiff OURANIA THIMMHARDY's disabilities caused her to become paranoid, easily confused, defensive, agitated, stressed, fearful, and anxious, including making it difficult for her to process relayed information and to verbalize her own thoughts, feelings, and intentions.

18.     Plaintiff OURANIA THIMMHARDY was known to act irrationally and speak incoherently when exhibiting symptoms of her disabilities.

### Arrest

19.     On or about October 5, 2024, Plaintiff OURANIA THIMMHARDY was arrested when she refused to leave a Starbucks store.

20.     Plaintiff OURANIA THIMMHARDY was experiencing a mental health crisis and manifesting symptoms of her disabilities when she was arrested.

21. Plaintiff OURANIA THIMMHARDY should have been placed on a mental health hold and transported to a mental health facility where she could receive treatment but, instead, she was booked into jail.

22. Plaintiff OURANIA THIMMHARDY was booked as a pretrial detainee into the Sacramento County Main Jail, 501 I Street, Sacramento, CA 95814, in the custody of Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER.

23. From October 5, 2025, to October 7, 2025, Plaintiff OURANIA THIMMHARDY was incarcerated at the jail.

24. Plaintiff OURANIA THIMMHARDY required mental health treatment for her disabilities while she was in custody but she received none.

**Release**

25. On October 7, 2025, around 11:00 p.m., Plaintiff OURANIA THIMMHARDY was processed for release from the jail.

26. During the release process, Plaintiff OURANIA THIMMHARDY continued to experience a mental health crisis and manifest symptoms of her disabilities.

27. Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5, deputy sheriffs employed by Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER, were involved with Plaintiff OURANIA THIMMHARDY's release process. Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3 were present and was responsible for interacting directly with Plaintiff OURANIA THIMMHARDY during the release process.

28. Defendant MATTHEW GURICH was located at a desk with a computer terminal used to facilitate the release process.

29. Defendant MATTHEW GURICH said, "Hello. Let me see your right hand. Alright. Just this one. Okay?"

30. Plaintiff OURANIA THIMMHARDY said, "Yeah."

31. Defendant MATTHEW GURICH said, "We've got to go like this."

4

32.     Defendant MATTHEW GURICH held Plaintiff OURANIA THIMMHARDY's right hand and guided it through a fingerprint scanner.

33.     Defendant MATTHEW GURICH said, "Because I've got to make sure that you're --"

34.     Defendant DOE 1 said, "You're having fun, huh?"

35.     Plaintiff OURANIA THIMMHARDY said, "This is -- it doesn't look like -- what is this supposed to do? Anyway."

36.     Defendant MATTHEW GURICH said, "Anyways. Alright. So, you have court."

37.     Plaintiff OURANIA THIMMHARDY said, "I have court."

38.     Defendant MATTHEW GURICH said, "You have court."

39.     Plaintiff OURANIA THIMMHARDY said, "Okay. So, this is a joke. They keep doing it."

40.     Defendant MATTHEW GURICH said, "No jokes."

41.     Plaintiff OURANIA THIMMHARDY said, "I was buying groceries."

42.     Defendant MATTHEW GURICH said, "Stop talking."

43.     Plaintiff OURANIA THIMMHARDY said, "This will not happen again, officers. No, no no. I'm -- we're honorable citizens, my husband and I. We own this beautiful home in the north Natomas area."

44.     Defendant MATTHEW GURICH said, "Okay."

45.     Plaintiff OURANIA THIMMHARDY said, "And -- and they're being trespassing in the backyard, in the backyard, by the neighbor's creek."

46.     Defendant DOE 1 said, "Oh, okay."

47.     Plaintiff OURANIA THIMMHARDY said, "And I told them not to trespass. And they're not -- well, they use superstition."

48.     Defendant MATTHEW GURICH said, "Huh."

49.     Plaintiff OURANIA THIMMHARDY said, "And they know your badges, your names."

50.     Defendant MATTHEW GURICH said, "That's fine, ma'am. Just go ahead and sign on that pad, okay?"

51.     Plaintiff OURANIA THIMMHARDY said, "This is very serious. They know you by badge, and they have you out in a certain way --"

52. Defendant DOE 1, who was standing nearby, said, "Good. Good."

53. Plaintiff OURANIA THIMMHARDY said, "-- including eyes, and they're looking to make them aggressive so that you --"

54. Defendant DOE 1 said, "Okay."

55. Plaintiff OURANIA THIMMHARDY said, "-- pardon, might ridicule them. They've got some kind --"

56. Defendant MATTHEW GURICH said, "If you want to go home, you've got to sign. Go ahead."

57. Plaintiff OURANIA THIMMHARDY said, "Yes. Okay."

58. Defendant MATTHEW GURICH said, "Okay."

59. Plaintiff OURANIA THIMMHARDY said, "I need my purse, please."

60. Defendant DOE 1 said, "We'll give you all that stuff in just a moment, ma'am."

61. Plaintiff OURANIA THIMMHARDY said, "Okay. The -- the purse --"

62. Defendant DOE 1 said, "Let's just finish the process and we'll get you your property."

63. Plaintiff OURANIA THIMMHARDY said, "I need to go home. Okay."

64. Plaintiff OURANIA THIMMHARDY used an electronic signature machine to sign her name at the desk where Defendant MATTHEW GURICH stood.

65. Plaintiff OURANIA THIMMHARDY said, "I don't have my glasses so it won't be very legible."

66. Defendant MATTHEW GURICH said, "That's fine."

67. Defendant DOE 1 said, "That's alright. As long as you acknowledge it, that's all that matters."

68. Plaintiff OURANIA THIMMHARDY said, "Anyway, I don't want to the court -- please, erase that. Make a big 'X'."

69. Defendant DOE 1 said, "We're not going to do that."

70. Plaintiff OURANIA THIMMHARDY said, "No, no. You cannot -- I'm going to leave it. I'm not going to go -- I -- there was a court for me --"

71. Defendant DOE 1 said, "If you don't go to judge -- if you don't agree to go to court, you

don't go home."

72.     Plaintiff OURANIA THIMMHARDY said, "Listen. Listen. If I -- what are you talking about?"

73.     Defendant DOE 1 said, "You can -- just sign the form."

74.     Plaintiff OURANIA THIMMHARDY said, "What kind of court, for this -- for this?"

75.     Defendant MATTHEW GURICH said, "Let's focus on this."

76.     Plaintiff OURANIA THIMMHARDY said, "Listen."

77.     Defendant MATTHEW GURICH said, "Sign, one more time."

78.     Plaintiff OURANIA THIMMHARDY said, "Just one more statement. One more statement."

79.     Defendant MATTHEW GURICH said, "Really? So, like, listen -- listen -- listen to me."

80.     Defendant MATTHEW GURICH walked towards Plaintiff OURANIA THIMMHARDY, stood in her personal space directly at her side right side, grabbed hold of her right shoulder with his left hand, and twisted her body around to face him.

81.     Plaintiff OURANIA THIMMHARDY said, "Okay. Please, don't touch me."

82.     Defendant MATTHEW GURICH said, "So, like, I need you to listen to me. I need you to listen to me."

83.     Defendant MATTHEW GURICH removed his hand from Plaintiff OURANIA THIMMHARDY's shoulder and began waving his hands in front of her face.

84.     Plaintiff OURANIA THIMMHARDY said, "Please watch your contact, okay?"

85.     Defendant MATTHEW GURICH said, "Okay."

86.     Plaintiff OURANIA THIMMHARDY said, "Please stand back. You will need me to sign?"

87.     Defendant MATTHEW GURICH said, "You need to stop fucking talking and just listen to us."

88.     Plaintiff OURANIA THIMMHARDY said, "What? What did you say?"

89.     Defendant MATTHEW GURICH pointed to the electronic signature machine and said, "Sign the form."

90.    Plaintiff OURANIA THIMMHARDY turned to Defendant DOE 1, seeking protection from Defendant MATTHEW GURICH. Defendant DOE 1 offered none.

91.    Plaintiff OURANIA THIMMHARDY said, "Look how they make the officers talk."

92.    Defendant MATTHEW GURICH said, "It's very simple. Sign the form."

93.    Plaintiff OURANIA THIMMHARDY said, "Okay. You better be more polite."

94.    Defendant MATTHEW GURICH said, "If you want to leave, sign the form."

95.    Plaintiff OURANIA THIMMHARDY said, "Try to be civilized, alright?"

96.    Defendant MATTHEW GURICH said, "I've been extremely polite with you.

97.    Plaintiff OURANIA THIMMHARDY said, "Okay. No. I'm a citizen. And I -- we pay part of your salary --"

98.    Defendant MATTHEW GURICH said, "Okay. That's fantastic."

99.    Plaintiff OURANIA THIMMHARDY said, "-- and the police department. We pay our taxes."

100.    Defendant MATTHEW GURICH said, "It's the sheriff's department."

101.    Plaintiff OURANIA THIMMHARDY said, "And we are -- we are very -- please do not to have another police to come --"

102.    Defendant MATTHEW GURICH said, "Oh, my god."

103.    Plaintiff OURANIA THIMMHARDY said, "-- and take me out of the grocery store --"

104.    Defendant MATTHEW GURICH pointed to the electronic signature machine and said, "Sign it."

105.    Plaintiff OURANIA THIMMHARDY said, "-- for trespassing."

106.    Defendant MATTHEW GURICH said, "If you want to go home, sign it."

107.    Plaintiff OURANIA THIMMHARDY said, "People -- customers don't trespass."

108.    Defendant MATTHEW GURICH said, "Sign the form."

109.    Plaintiff OURANIA THIMMHARDY said, "These people were trespassing. They have this -- they're confused."

110.    Defendant MATTHEW GURICH said, "Okay."

111.    Plaintiff OURANIA THIMMHARDY signed her name on the form using the electronic

8

1  signature machine.

2        112.   Plaintiff OURANIA THIMMHARDY said, "There is an F.B.I. report about this. They are

3  -- they are classified as domestic terrorism."

4        113.   Defendant MATTHEW GURICH said, "Okay."

5        114.   Plaintiff OURANIA THIMMHARDY said, "Okay."

6        115.   Defendant MATTHEW GURICH said, "I have three questions for you. Please listen to

7  me, okay?"

8        116.   Plaintiff OURANIA THIMMHARDY said, "Yes."

9        117.   Defendant MATTHEW GURICH said, "While you were here, in jail, did you get

10  injured?"

11        118.   Plaintiff OURANIA THIMMHARDY said, "I was't here. I wasn't in jail."

12        119.   Defendant MATTHEW GURICH slammed his fists down onto the desk in front of

13  Plaintiff OURANIA THIMMHARDY.

14        120.   Plaintiff OURANIA THIMMHARDY said, "I was in that room."

15        121.   Defendant MATTHEW GURICH said, "Okay. Again, I need you to not talk. Just focus on

16  me. Listen to my questions."

17        122.   Plaintiff OURANIA THIMMHARDY said, "Yes. But I'm correcting your statement."

18        123.   Defendant MATTHEW GURICH said, "Okay."

19        124.   Plaintiff OURANIA THIMMHARDY said, "Okay. I was in that room."

20        125.   Defendant MATTHEW GURICH said, "While you were here, in this building --"

21        126.   Plaintiff OURANIA THIMMHARDY said, "Yes."

22        127.   Defendant MATTHEW GURICH said, "-- did you get injured, at all? While you were

23  here, in this building?"

24        128.   Plaintiff OURANIA THIMMHARDY said, "In my abdomen."

25        129.   Defendant MATTHEW GURICH said, "How did you get injured in your abdomen?"

26        130.   Plaintiff OURANIA THIMMHARDY said, "There is somebody harm that this women

27  caused."

28        131.   Defendant MATTHEW GURICH said, "Okay."

9

132.    Plaintiff OURANIA THIMMHARDY said, "With A.I."

133.    Defendant MATTHEW GURICH said, "Would you like this --"

134.    Plaintiff OURANIA THIMMHARDY said, "Okay. I'm not going to continue. I was not. Let's put it that way."

135.    Defendant MATTHEW GURICH said, "Okay. You were not. Perfect."

136.    Plaintiff OURANIA THIMMHARDY said, "Stop it. I told you this and -- okay."

137.    Defendant MATTHEW GURICH said, "Okay."

138.    Plaintiff OURANIA THIMMHARDY said, "Your next question, please?"

139.    Defendant MATTHEW GURICH said, "Next question: would you like to see a nurse?"

140.    Plaintiff OURANIA THIMMHARDY said, "No."

141.    Defendant MATTHEW GURICH said, "Okay. Do you have -- would you -- do you have any complaints, other than everything that you've already been saying over the last five hours?"

142.    Plaintiff OURANIA THIMMHARDY said, "Well, I have complaints about the conduct, of course. And the fact that I'm here because I went to shop at a grocery store and they have done this repeatedly. Look at your record. They want me out of the house. They took our I.D.s. They caused my husband I -- we have identity theft. They stole our computers."

143.    Defendant MATTHEW GURICH said, "Okay. Again, listen. Listen. So, like, complaints --"

144.    Plaintiff OURANIA THIMMHARDY said, "Do you want to hear what I'm saying?"

145.    Defendant MATTHEW GURICH said, "I don't, really. The complaints --"

146.    Plaintiff OURANIA THIMMHARDY said, "I don't want to hear what you're saying, deputy -- are you sheriff? Really?"

147.    Defendant MATTHEW GURICH said, "The complaints -- do you have complaints that were happened, in this building?"

148.    Plaintiff OURANIA THIMMHARDY said, "Sheriffs and deputy sheriffs."

149.    Defendant DOE 1 said, "What?"

150.    Plaintiff OURANIA THIMMHARDY said, "I saw your problem. I called the sheriffs and the deputy sheriffs. I said, 'What's going on?' And I have done and I have made the comment last time

10

here."

151.    Defendant DOE 1 said, "Ma'am, just go ahead and sign the pad."

152.    Defendant MATTHEW GURICH said, "I'm just going to stand here and listen to her fucking go off."

153.    Plaintiff OURANIA THIMMHARDY said, "How many? I signed, I signed, I signed."

154.    Defendant DOE 1 said, "Two more. Two more, that's it. Two more."

155.    Plaintiff OURANIA THIMMHARDY said, "What do you mean, 'two more'?"

156.    Defendants DOE 2 said, "Signatures."

157.    Plaintiff OURANIA THIMMHARDY said, "Where do this go? Are criminals --"

158.    Defendant DOE 1 said, "Just put 'refused'."

159.    Plaintiff OURANIA THIMMHARDY said, "Okay. Listen. Criminals are controlling your department."

160.    Defendant DOE 1 said, "Just put 'refused'."

161.    Defendant MATTHEW GURICH picked up the writing instrument attached to the electronic signature machine and handed it to Plaintiff OURANIA THIMMHARDY, who accepted the instrument.

162.    Plaintiff OURANIA THIMMHARDY said, "I need the report – exactly what I sign, I going to have a photocopy, alright? Okay. I'm going to report this to the police."

163.    Defendant DOE 3 said, "We are the police."

164.    Plaintiff OURANIA THIMMHARDY said, "You are the police, you are the sheriff?"

165.    Defendant DOE 2 said, sarcastically, "You -- you reported it to us. Thank you."

166.    Plaintiff OURANIA THIMMHARDY said, "I reported you in the past. I reported it. This is -- doesn't make any sense. We don't know where this goes. It can go to any criminal entity. And this women, trust me, they are criminals. And they are dumb criminals."

167.    Defendant DOE 3 said, "Sign it! Sign it!"

168.    Plaintiff OURANIA THIMMHARDY said, "Because they are dumb."

169.    Defendant DOE 1 said, "Just put 'refused.'"

170.    Plaintiff OURANIA THIMMHARDY said, "They're dumb and they want to make dumb -

11

-."

171.    Defendant MATTHEW GURICH grabbed the writing instrument attached to the electronic signature machine which Plaintiff OURANIA THIMMHARDY held in her right hand and pulled it out of her hand. Defendant MATTHEW GURICH yanked the electronic signature machine off the desk, as he grabbed the writing instrument from Plaintiff OURANIA THIMMHARDY hand.

172.    Plaintiff OURANIA THIMMHARDY said, "-- sheriffs and police. Okay. Please, make sure. Make sure --"

173.    Defendant DOE 1 said, "Stay with property."

174.    Plaintiff OURANIA THIMMHARDY said, "What? They harass me. They go in your systems. I -- they send it before, to you, another time."

175.    Defendant MATTHEW GURICH ignored Plaintiff OURANIA THIMMHARDY, did not acknowledge her, and began whistling in her face.

176.    Plaintiff OURANIA THIMMHARDY said, "This, because I go to Starbucks. Listen. The deputies -- listen. The sheriffs -- whatever. In back of the Starbucks, on Arena Boulevard -- I mean, next to the fresh cleaners --"

177.    Defendant DOE 1 said, "What 'Boulevard'?"

178.    Defendant DOE 2 laughed, as Defendant DOE 1 sarcastically questioned Plaintiff OURANIA THIMMHARDY while she was experiencing a mental health crisis.

179.    Plaintiff OURANIA THIMMHARDY said, "Elk Horn Boulevard and Arena Boulevard."

180.    Defendant DOE 1 said, "Wait, wait. Which one?"

181.    Plaintiff OURANIA THIMMHARDY said, "Listen. Arena, in Natomas. Okay?"

182.    Defendant DOE 1 said, "Oh, you were saying Starbucks or Dutch Bros.?"

183.    Plaintiff OURANIA THIMMHARDY said, "It's a -- it's --"

**Assault**

184.    Defendant MATTHEW GURICH grabbed some documents from the desk and handed it to Plaintiff OURANIA THIMMHARDY.

185.    Defendant MATTHEW GURICH said, "Here's your stuff."

186.    Plaintiff OURANIA THIMMHARDY said, "Okay."

12

187.    Defendant MATTHEW GURICH said, "Start walking this way."

188.    Plaintiff OURANIA THIMMHARDY said, "Okay."

189.    Defendant MATTHEW GURICH said, "Start walking this way."

190.    Defendant MATTHEW GURICH grabbed hold of Plaintiff OURANIA THIMMHARDY's left arm, spun her around, and began pushing her.

191.    Plaintiff OURANIA THIMMHARDY stumbled forward.

192.    Plaintiff OURANIA THIMMHARDY turned back towards Defendant MATTHEW GURICH and said, "Don't push me."

193.    Defendant MATTHEW GURICH said, "Shut the fuck up."

194.    Defendant DOE 1 said, "Hey, keep your hands down."

195.    Defendant MATTHEW GURICH said, "Start walking this way."

196.    Plaintiff OURANIA THIMMHARDY said, "What?"

197.    Defendant MATTHEW GURICH grabbed hold of Plaintiff OURANIA THIMMHARDY's left wrist with his left arm and twisted her wrist behind her back. Defendant MATTHEW GURICH grabbed hold of Plaintiff OURANIA THIMMHARDY's shirt with his right hand and continued pushing her, with her wrist in a control hold.

198.    Plaintiff OURANIA THIMMHARDY said, "What are you doing? What are you doing?"

199.    Defendant DOE 1 said, "You need to keep your hands to yourself."

200.    Defendant DOE 1's statement, "You need to keep your hands to yourself," was a pretext for Defendant MATTHEW GURICH's unnecessary use of force against Plaintiff OURANIA THIMMHARDY, where Defendant DOE 1 observed that Defendant MATTHEW GURICH was using unreasonable force and attempted to justify it by falsely implying that Plaintiff OURANIA THIMMHARDY was not keeping her hands to yourself.

201.    Defendant DOE 1 grabbed hold of Plaintiff OURANIA THIMMHARDY's right arm and pulled it behind her back, as Defendant MATTHEW GURICH held her left arm twisted behind her back in a controlled hold.

202.    Plaintiff OURANIA THIMMHARDY said, "What are you doing?"

203.    Defendant MATTHEW GURICH slammed Plaintiff OURANIA THIMMHARDY head

first into a door covered by a meal panel.

204.    Defendants DOE 2 and DOE 3 watched and followed behind Defendants MATTHEW GURICH and DOE 1, as they grabbed, pushed, and assaulted Plaintiff OURANIA THIMMHARDY, without cause.

205.    Defendant MATTHEW GURICH said, "Start walking this way."

206.    Plaintiff OURANIA THIMMHARDY said, "What are you doing?"

207.    Defendant DOE 1 said, in a sarcastic and playful tone, "We're escorting you outside because you can't go without assaulting my partner."

208.    Plaintiff OURANIA THIMMHARDY said, "Me? I assaulted your partner?"

209.    Defendant DOE 1 said, "Yes, you did."

210.    Defendant MATTHEW GURICH said, "You're okay."

211.    Plaintiff OURANIA THIMMHARDY said, "Okay. You're what's wrong. You be careful. You're really superstitious. Save your -- say a prayer."

212.    Defendant MATTHEW GURICH opened a door and continued pushing Plaintiff OURANIA THIMMHARDY towards to front door of the jail, while continuing to twist her wrist behind her back in a control hold.

213.    Defendant DOE 1 continued holding Plaintiff OURANIA THIMMHARDY's right arm.

214.    Defendant MATTHEW GURICH said, "Stop looking at us."

215.    Plaintiff OURANIA THIMMHARDY said, "Say your prayers."

216.    Defendant MATTHEW GURICH said, "We'll be okay."

217.    Plaintiff OURANIA THIMMHARDY said, "They want to -- they want to sue the department. I'm telling you, they want to sue the department."

218.    Defendant MATTHEW GURICH said, "Okay."

219.    Plaintiff OURANIA THIMMHARDY said, "Okay. This is terrible contact. This is contact. You going to be reported."

220.    Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3 and Plaintiff OURANIA THIMMHARDY reached the front doors of the jail, while Defendants MATTHEW GURICH and DOE 1 continued to hold onto Plaintiff OURANIA THIMMHARDY.

14

221.    Defendants DOE 4 and DOE 5 were present at the jail's front doors, and held open the doors.

222.    Defendant DOE 3 said, "This is outside"

223.    Plaintiff OURANIA THIMMHARDY said, "The F.B.I is overseeing this and how you are."

224.    Defendant DOE 2 said, sarcastically, "Goodbye."

225.    Defendant MATTHEW GURICH said, "Stop talking. You'll be okay."

226.    Defendant DOE 3 said, sarcastically, "Thank you. Have a good night."

227.    Defendant MATTHEW GURICH shoved Plaintiff OURANIA THIMMHARDY with great force through the air and onto the ground outside of the jail.




Matthew Gurich shoving 71-year-old Ourania Thimmhardy to the ground and injuring her.

15

228.    Defendants DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 looked on, without protest or intervention, as Defendant MATTHEW GURICH used excessive force against Plaintiff OURANIA THIMMHARDY.

229.    Defendant MATTHEW GURICH's shove caused Plaintiff OURANIA THIMMHARDY to fly through the air before landing heavily on the ground.

230.    Plaintiff OURANIA THIMMHARDY was seriously injured by Defendant MATTHEW GURICH's forceful shove, including sustaining a displaced intertrochanteric fracture of her right femur.

231.    Defendant DOE 1 said, "Oof," after watching Plaintiff OURANIA THIMMHARDY strike the ground.

232.    Plaintiff OURANIA THIMMHARDY immediately began groaning and moaning in pain after Defendant MATTHEW GURICH shoved her to the ground.

233.    Defendant MATTHEW GURICH turned to Defendants DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 and smirked, after shoving Plaintiff OURANIA THIMMHARDY to the ground and observing her injured on the ground.



Matthew Gurich, smirking with fellow deputy sheriffs, after shoving 71-year-old Ourania Thimmhardy to the ground.

234.    Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 knew, or should have known, that Plaintiff OURANIA THIMMHARDY suffered serious injury after Defendant MATTHEW GURICH shoved her to the ground, including based on the observed force Defendant MATTHEW GURICH used against Plaintiff OURANIA THIMMHARDY, Plaintiff OURANIA

16

THIMMHARDY's falling and striking the ground, and Plaintiff OURANIA THIMMHARDY's groaning and moaning and striking the ground.

235.     Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 ignored Plaintiff OURANIA THIMMHARDY and the injuries she sustained.

236.     Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 closed the door to the jail, turned away from Plaintiff OURANIA THIMMHARDY, and left her injured on the ground.

237.     Plaintiff OURANIA THIMMHARDY remained lying on the ground, injured, outside of the jail for an extended period of time after she was shoved to the ground by Defendant MATTHEW GURICH.

238.     Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 failed to utilize appropriate policies, training, standards, and procedures, including California Commission on Peace Officer Standards and Training ("POST") Learning Domain 20 (Use of Force/Deescalation), Learning Domain 31 (Custody), Learning Domain 34 (First Aid, CPR, and AED), Learning Doman 37 (People with Disabilities); and Sacramento County Sheriff's Department Custody Policy Manual Policy 510 (Custody Emergency Response Team (CERT) and Force Application on Incarcerated Persons), Policy 602 (Incarcerated Persons with Disabilities), Policy 701 (Access to Health Care).

**Hospitalization & Injuries**

239.     Eventually, Plaintiff OURANIA THIMMHARDY obtained transportation to a hospital for medical care regarding the injuries she sustained.

240.     Plaintiff OURANIA THIMMHARDY's treatment included placement of a pin in the ball of her humorous and, as a result, she is not now able to climb stairs. Plaintiff OURANIA THIMMHARDY's injuries are expected to require ongoing and continuous medical care in the future.

241.     Plaintiff OURANIA THIMMHARDY's mental health has continued to deteriorate because of the assault and the injuries she sustained.

242.     Plaintiff OURANIA THIMMHARDY is expected to require the assistance of care-workers for the remainder of her life.

243.     During the time she was hospitalized, Plaintiff OURANIA THIMMHARDY's husband

17

who was at home, suffering from Alzheimer's disease, was hospitalized, and then expired. Plaintiff OURANIA THIMMHARDY not able to visit her husband before he died because she, herself, was in the hospital.

244.    Plaintiff OURANIA THIMMHARDY's husband's last wish was to be returned to Romania and laid to rest in a family plot. Due to her injuries and hospitalization, Plaintiff OURANIA THIMMHARDY could not timely contact the funeral home, time passed, and her husband's body was not in condition to be returned to Romania for burial. Instead, Plaintiff OURANIA THIMMHARDY's husband was buried in Sacramento against his final wishes. Plaintiff OURANIA THIMMHARDY suffered severe emotional distress resulting from her inability to fulfill her husband's final wishes and burial arrangements.

245.    During the time she was hospitalized, Plaintiff OURANIA THIMMHARDY's home was left unoccupied and had to be boarded-up, degrading the value of the property.

## POLICY / CUSTOM ALLEGATIONS

246.    Defendant JIM COOPER has served as Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's Sheriff since December 2022.

247.    Defendant JIM COOPER, in his capacity as Sheriff, is and was a final policymaking authority for Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, including as it relates to the training, supervision, and discipline of law enforcement personnel under his command. Sacramento County Sheriff's Department Policy Manual Policy 202 (Training).

248.    Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER failed adequately to train, supervise, and discipline officers under their command in critical areas related to unreasonable force, including Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5. For example:

    (a)    the application of excessive and unreasonable use of force against non-threatening persons, including vulnerable, ill, and/or elderly arrestees/detainees;

    (b)    the inadequate training of personnel with respect to the use of force;

    (c)    the employment, retention, supervision, training, control, assignment, and disciple

18

of personnel with dangerous propensities for abusing authority;

(d)    the maintenance of inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by personnel;

(e)    the inadequate or non-existent discipline of personnel, including imposition of discipline that is disproportional to the magnitude of the misconduct and fails to discourage future misconduct or is tantamount to encouraging misconduct ("slaps on the wrist");

(f)    the announcement that unjustified uses of force are "within policy," including incidents that are later determined in court or implied through settlement to be non-compliant with policy or unlawful;

(g)    the inadequate investigation of uses of force, including refusal to consider relevant witness and evidence;

(h)    the untimely, delayed, or prolonged investigation of uses of force, such that determination of culpability, if any, is returned after the period of time during which effective corrective action or meaningful discipline can be taken;

(i)    the refusal to discipline, terminate, or retrain personnel, where uses of force are determined in court or implied through settlement to be non-compliant with policy or unlawful;

(j)    the encouragement, accommodation, or facilitation of a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," "blue line," "turn a blind eye," or "code of silence," pursuant to which personnel do not report errors, misconduct, or crimes and, if questioned about an incident of misconduct involving another officer, claim ignorance of misconduct;

(k)    the maintenance of a policy of inaction and an attitude of indifference towards ongoing law enforcement use of force incidents, including by failing to discipline, retrain, investigate, terminate, and recommend personnel for criminal prosecution who participate in unlawful uses of force; and/or

(l)    Failure to summon and provide necessary and emergent medical care for persons with necessary and immediate medical needs who were subject to excessive and unreasonable use of force.

249.    "Push-Out" Policy: Defendants COUNTY OF SACRAMENTO, SACRAMENTO

19

COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER knowingly participated in, acquiesced to, and/or were deliberately indifferent to the creation and maintenance of a custom or practice whereby personnel "push-out" or shove detainees upon release or exit from the jail, constituting unreasonable, unnecessary, and excessive force against detainees. These use of force incidents are frequent, often-daily occurrences, especially during "mass" release periods when several persons are released from the jail at once. These incidents are captured on recordings by surveillance cameras located outside of the jail but the recordings are not properly preserved or utilized for disciplinary purposes or submitted up the chain-of-command for supervisory scrutiny. Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER have received multiple complaints and grievances regarding the use of force incidents, without proper resolution, disciplinary action, or rectification.

250.    _Mays_ Consent Decree: Since January 2020, Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and their personnel, have been subject to a jail conditions consent decree entered in _Mays v. County of Sacramento_, No. 2:18-cv-02081-TLN-CSK, ECF No. 85-1 & 110 (E.D. Cal. Jan. 8, 2020). Since the consent decree was entered, Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, including custody personnel, have repeatedly failed to comply with the terms of the consent decree. For example:

(a)    On August 19, 2024, _Mays_ court-appointed class counsel sent a letter to Defendants SACRAMENTO COUNTY SHERIFF'S DEPARTMENT and JIM COOPER relating to the "wave of deaths in the Sacramento County Jails in recent months." Therein, class counsel found: "For years, we have raised concerns about the custody culture of the Sacramento Sheriff's Office. Having reviewed the surveillance and body-worn camera footage of several recent deaths, we write to again express our deep concern about the SSO's failure to respond with humanity and decency to people in need. * * * [T]he story of [the May 12, 2024, in-custody death of David Barefield] highlights a profound and persistent problem with the Sheriff's Office—callousness, apathy, and unacceptable tolerance for human suffering. The deputies who processed this man through the booking process did so with no regard for his extreme physical distress. An hour before he died, they told him he was playing games

20

because he was unable to stand. They did not deviate from their standard booking protocol for a person in the final moments of his life. They grabbed him by the hair to take his intake photo. As he laid on the floor, they held his limp hand on the fingerprint scanner to make sure his fingerprints were captured in the system. They were simply going about business as usual. * * * This callousness on the part of the Sacramento Sheriff's Office is consistent with our reporting over the years. We and the court-appointed experts have reported for years about these profound cultural problems. * * * The recent deaths in the jails are a symptom of a larger and long-standing cultural problem with the Sacramento Sheriff's Office. The Sheriff must take accountability for the apathy and callousness that pervades the jail and exercise leadership to make immediate changes. Sacramento County should demand decency for the people it incarcerates." Mays *Class Counsel Letter to Sheriff Jim Cooper* (Aug. 19, 2024), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/24.08.19%20Mays%20Counsel%20to%20Sheriff%20Cooper%20re%20Recent%20Jail%20Deaths.pdf>.

(b)      On August 14, 2024, *Mays* court-appointed medical experts sent a letter to Defendant COUNTY OF SACRAMENTO relating to "Recent Mortalities at Sacramento County Jail," including "five deaths in the Sacramento County Jails" since "May 2024." Therein, the medical experts determined: "Review of these deaths showed serious system and individual performance issues, including inadequate emergency response, inadequate medical care prior to death, and in one case, callous deliberate indifference to a man who was so obviously gravely ill that even a lay person would see that the patient needed emergent care. . . . Through review of medical records and video footage, we concluded that some of the recent deaths in the jail may have been preventable. We also determined that immediate action must be taken by ACH [Adult Correctional Health] and the Sacramento Sheriff's Office (SSO) to address dangerous deficiencies in current practices." *Letter Re: Recent Mortalities at Sacramento County Jail* (Aug. 14, 2024), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/24.08.14%20Letter%20to%20Sacramento%20County%20Regarding%20Mortalities%20in%202024_Redacted.pdf>.

(c)      On May 15, 2024, *Mays* court-appointed class counsel sent a letter to Defendant

21

COUNTY OF SACRAMENTO relating to the jail's overpopulation. Therein, class counsel found: "After years of monitoring, the situation remains dire. People detained in the Jail are still being subjected to dangerous and unlawful conditions that fall short of basic constitutional standards." *Letter Re: Sacramento County Jail Population & Superior Court Review Process* (May 15, 2024), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/24.05.15%20Mays_Sacramento%20County%20SCR%20Process%20%281%29.pdf>.

(d)     On October 6, 2023, *Mays* court-appointed class counsel sent a letter to Defendant COUNTY OF SACRAMENTO relating to the jail's annex and overpopulation. Therein, class counsel found: "The County is currently in violation of the *Mays* Consent Decree, as it continues to incarcerate people in facilities that do not meet these basic requirements of the Consent Decree. These violations harm our clients by incarcerating them in dangerous and inhumane conditions. The County must devise and implement a plan to remediate these deficiencies in a timely manner, but it is free to determine the manner in which to comply with its legal obligations." Mays *Class Counsel Letter to Deputy County Executive Eric Jones* (Oct. 6, 2023), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/23.10.06%20Ltr%20re%20Annex%20and%20Jail%20Population.pdf>.

(e)     On August 28, 2023, *Mays* court-appointed class counsel sent a letter to Defendant COUNTY OF SACRAMENTO relating to Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's lack of leadership. Therein, class counsel found: "[M]onitoring reports demonstrate ongoing and substantial noncompliance with the requirements of the Remedial Plan. This chronic noncompliance harms the people in the Sacramento County Jails and also stands to extend the duration of the federal court oversight over the Sacramento County Jails. Absent meaningful progress, class counsel is prepared to seek receivership over aspects of the jail administration. [¶] The County's failure to achieve compliance with the Consent Decree reflects significant structural deficiencies in the SSO. The constant rotation of staff, even high-level officers, between patrol and corrections and other units means that no one in the SSO takes sustained ownership over Consent Decree compliance. New jail leaders scarcely have time to gain an understanding of the Consent Decree and its implications for jail practices and conditions before they are rotated out of the jail. Even the most skilled compliance lieutenants lack sufficient time on the job to make meaningful progress before they are replaced by staff with little

22

knowledge of the Consent Decree. The SSO recently lost a particularly capable compliance lieutenant who was rotated out to patrol and therefore unable to complete important ongoing initiatives that would move the County towards compliance with the Consent Decree. [¶] In our experience in numerous carceral systems, this structure is a recipe for failure. The SSO must create one or more permanent positions to lead Consent Decree implementation and oversee the major changes needed. Other counties have done this with success. The SSO needs stable leadership to set expectations, engage in long-range planning, report on progress and setbacks, and hold staff accountable to the County's legal obligations. Some counties under consent decree or court order have done this successfully by establishing a high-level civilian position to oversee compliance. Establishing a captain-level position dedicated to consent decree implementation may also be an effective approach." Mays *Class Counsel Letter to County Executive Ann Edwards & Deputy County Executive Eric Jones* (Aug. 28, 2023), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/23.08.28%20Ltr%20re%20SSO%20Leadership%20.pdf>.

(f)      On August 7, 2023, *Mays* court-appointed class counsel sent a letter to Defendants SACRAMENTO COUNTY SHERIFF'S DEPARTMENT and JIM COOPER relating to Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's failure to screen jail staff to prevent the flow of drugs into jail facilities. Therein, class counsel found: "The Sacramento County Jail is in crisis. Drugs are widely available inside the facilities, and people are dying as a result. Despite the serious risk of harm to people in the Jail, the Sacramento Sheriff's Office (SSO) is failing to make appropriate and sensible interdiction efforts to stop drugs from entering the jails. [¶] The SSO currently has no policy requiring custody staff to be screened in any way when they enter the jails. The SSO's failure to screen staff is unacceptable, and we demand that the SSO immediately develop a policy to screen custody staff and their bags when they enter the facilities as part of its drug interdiction protocols. * * * According to the County's own data, Narcan, the life-saving emergency treatment for opioid overdose, has been administered at the Jail around 30 times since February 1, 2023. People in custody are overdosing on drugs at staggering rates. [¶] * * * By SSO policy, deputies are not required to walk through a scanner or any screening technology. They are not required to have their bags or their person searched. They are not required to have clear bags to prevent them from concealing contraband. There are zero security

23

measures in place to prevent custody staff from bringing contraband, including drugs, into the jails. Even after the recent deaths, it appears that the SSO has no plan to implement a staff screening policy. [¶] This situation must change. In a system where drugs are widely available, people are frequently overdosing and dying, and the system is repeatedly failing to provide adequate withdrawal care, it is indefensible to allow custody staff to walk into the jails with no screening protocols." *Letter Re: In-Custody Deaths Jail and the SSO's Failure to Screen Staff to Prevent the Flow of Drugs into the Jails* (Aug. 7, 2023), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/23.08.07%20Ltr%20re%20Sacramento%20County%20Custody%20Staff%20Screening.pdf >. In response, on August 14, 2023, to Defendants SACRAMENTO COUNTY SHERIFF'S DEPARTMENT and JIM COOPER responded and refused to to implement custody staff screening measures. *Email Re: Custody Staff Screening Measures* (Aug. 14, 2023), available at: <https://www.disabilityrightsca.org/system/files/file-attachments/23.08.14%20-%20Mays_County%27s%20Response%20re_%20Letter%20re_%20Custody%20Staff%20Screening%20Measures.pdf>.

251.    <u>Unreasonable Force</u>: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER knowingly participated in, acquiesced to, and/or were deliberately indifferent to the creation and maintenance of a culture permitting or encouraging personnel's use of unreasonable and excessive force, including Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5. For example:

(a)    On November 20, 2023, KyrieAnna Liles, an unarmed and mentally-ill woman, was shot by Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's personnel, including deputies Matthew Bollinger and Spencer Hettema. Report No. 23-369374. The subject was known to be experiencing a mental health episode. The deputies contacted the subject in the driveway of her residence, as she sat inside of her vehicle. The deputies reached into the subject's car, unprovoked, and attempted to drag her from the vehicle, without warning. The subject became fearful and fled the scene in her vehicle. As the subject drove away from the deputies, they opened-fire with pistols aimed at the back of the subject's vehicle, wildly firing into the vehicle and nearby homes in the residential neighborhood. The subject's vehicle was riddled with bullets, including one which struck the subject's right arm. The

deputies falsely reported that the subject attempted to run-over one of the deputies with her vehicle, and she was charged with attempted murder. Following a criminal trial, the subject was acquitted. *People v. Liles*, No. 23FE018938 (Sacramento Cnty. Super. Ct.). A civil rights lawsuit was filed. *Liles v. County of Sacramento*, No. 2:24-cv-00416-KJM-CKD (E.D. Cal.). The case settled pretrial for $425,000.

(b)      On October 21, 2017, Mayco Rodrique was arrested and booked into the Sacramento County Main Jail by Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's personnel, including deputies Jarrod Hopeck and Jeffrey Wilson. Hopeck intentionally twisted and broke the detainee's arm during the jail intake process. The detainee was confined to a "sobering" cell and denied access to medical staff for 20 minutes, while Hopeck taunted the injured detainee who was pleading for medical attention through a window on the cell door. The incidents were captured on the jail's surveillance cameras. A citizen complaint was filed but the sheriff's department "exonerated" Hopeck. Report No. 17-303197. A civil rights lawsuit was filed. *Rodrique v. County of Sacramento*, No. 2:17-cv-02698-WBS-EFB (E.D. Cal.). The case was settled pretrial for $97,500. The lawsuit resulted in disclosure of numerous citizen complaints and dispositions by the sheriff's department. The Sacramento Bee, *Sheriff Jones must come clean on abuse in county jails* (Dec. 27, 2019), available at: <https://www.sacbee.com/opinion/article238722483.html>. The citizen complaint files revealed that the sheriff's department and sheriff were "concealing the violent abuse of inmates by deputies in his jail and allowing the guilty deputies to remain in uniform." For example, the sheriff overruled a recommendation to discipline a subordinate who was captured on camera using excessive force, and "exonerated" numerous meritorious citizen complaints against personnel. The Sacramento Bee, *Here's a sample of the abuse claims made against Sacramento County jail deputies* (Dec. 22, 2019), available at: <https://www.sacbee.com/news/investigations/article238544198.html>.

(c)      On May 8, 2017, 32-year-old Mikel McIntyre, an unarmed and mentally-ill Black man, was shot and killed by Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's personnel, including deputies Jeffrey Wright, Ken Becker, and Gabriel Rodriguez. Report No. 17-150089. The decedent was known to be experiencing a mental health episode, when deputies conducted a mental health contact with the subject hours earlier. During the subsequent contact, the decedent threw a rock and attempted to flee from the deputies. In response, the deputies shot at the decedent with 26

25

bullets, killing him. The sheriff's department found the deputies' conduct to be within policy. A civil rights lawsuit was filed. *N.M. v. County of Sacramento*, No. 2:18-cv-01830-WBS-KJN (E.D. Cal.). The case was settled pre-trial for $1,725,000. The Sacramento County Inspector General's Office issued an officer-involved shooting review of the incident.

<https://inspectorgeneral.saccounty.net/Documents/McIntyre_OIS_Report.pdf>. Therein, the inspector general found that the deputies fired an "excessive, unnecessary" number of rounds during the shooting. In response to the critical report, the sheriff retaliated against the inspector general by locking the inspector general out of agency offices and jail facilities which prevented further oversight of official misconduct by the inspector general. The Sacramento Bee, *Sacramento sheriff lockout enhances calls for oversight* (July 5, 2019), available at: <https://www.sacbee.com/news/local/article232326467.html>.

(d)     Paul "Scotte" Pfeifer was a deputy sheriff employed by Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and sheriff Scott Jones. Pfeifer utilized excessive force against persons he encountered on multiple occasions, including by striking them with a department-issued flashlight. Pfeifer's assaults were documented and captured on recordings on multiple occasions, including in multiple lawsuits each of which were settled for substantial amounts paid to injured persons. *Treshchuk v. McGinness*, No. 2:09-cv-00691-MCE-EFB (E.D. Cal.) (Pfeifer struck the plaintiff in her legs multiple times with a flashlight; case settled pre-trial for $20,000); *Reyes v. County of Sacramento*, No. 34-2015-00184139-CU-CR-GDS (Sacramento Cnty. Super. Ct.) & No. 2:15-cv-02213-JAM-DB (E.D. Cal.) (Pfeifer was recorded assaulting the plaintiff in the middle of street, including by striking him multiple times with a flashlight; case was settled pre-trial for $200,000); *Donohue v. County of Sacramento*, No. 2:15-cv-01488-CKD (E.D. Cal.) (Pfeifer was recorded assaulting the plaintiff while he was sitting in the driver's seat of a vehicle surrendering; case settled pre-trial for $150,000); *see also* The Sacramento Bee, *Sacramento County paying $200,000 in third lawsuit involving flashlight-wielding deputy* (Oct. 11, 2016), available at: <http://www.sacbee.com/news/investigations/the-public-eye/article107619287.html>. The sheriff's department failed adequately to supervise, re-train, or discipline Pfeifer following each of the incidents of misconduct and he was retained as an employee.

(e)     Several jury verdicts have been entered against Defendants COUNTY OF

26

SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and/or their personnel, where excessive and unreasonable force was proven at trial. *See, e.g., Rose v. County of Sacramento*, No. 2:13-cv-01339-TLN-EFB (E.D. Cal.) ($6,500,000 jury verdict for excessive force where a deputy shot and killed a 24-year-old mentally ill man, after the deputy "brushed" aside the decedent's father and confronted the sleeping decedent in his bed before shooting and killing him at pointblank range); *Reese v. County of Sacramento*, No. 2:13-cv-00559-WBS-DB (E.D. Cal.) (jury verdict against deputy who used excessive force when he shot a man inside of his home upon opening a door in response to the deputy's command); *Jones v. County of Sacramento*, No. 2:09-cv-1025-DAD (E.D. Cal.) (jury verdict for excessive force against five deputies); *Antoine v. County of Sacramento*, No. 2:06-cv-01349-WBS-GGH (E.D. Cal.) (jury verdict for excessive force against five deputies); *Hunter v. County of Sacramento*, No. 2:06-cv-00457-GEB-AC (E.D. Cal.) (jury verdict for policy or custom of subjecting inmates to excessive force at the jail); *Tubbs v. Sacramento County Jail*, No. 2:06-cv-00280-LKK-GGH (E.D. Cal.) (jury verdict for excessive force and integral participation against four deputies); *Johnson v. Sacramento County*, No. 2:06-cv-00169-RRB-GGH (E.D. Cal.) (jury verdict for excessive force against multiple deputies).

(f)　　　Numerous settlements have been paid by Defendant COUNTY OF SACRAMENTO to resolve legitimate claims of misconduct by Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, and/or their personnel, including to settle litigation where excessive and unreasonable force was alleged and could have been proven, if tried. *See, e.g., Bencomo v. County of Sacramento*, No. 2:23-cv-00440-DAD-JDP (E.D. Cal.) (settlement for claims that deputy sicced a police canine on a sleeping arrestee located inside of a bedroom); *Flemmings v. County of Sacramento*, No. 2:20-cv-00500-WBS-AC (E.D. Cal.) (settlement for claims that deputies unlawfully pulled-over the plaintiff's vehicle, pulled him from the vehicle, and slammed and pinned him face-first onto the roadway); *Soto v. County of Sacramento*, No. 2:19-cv-00910-TLN-DB (E.D. Cal.) (settlement for claims that deputy ignored an injured inmate's requests for medical assistance, hog-tied his arms and legs, and left him to die on the floor of a holding cell); *Mitchell v. County of Sacramento*, No. 2:18-cv-03252-WBS-EFB (E.D. Cal.) (settlement for claims that deputy slammed the arrestee's head against a wall causing a concussion, breaking a tooth, and

27

splitting her lip); *Dunn v. County of Sacramento*, No. 2:18-cv-02425-JAM-CKD (E.D. Cal.) (settlement for claims that two deputies unlawfully pulled-over the arrestee's vehicle, pulled her from the vehicle, struck her in the face several times with fists and a flashlight, and broken her arm); *Reynolds v. County of Sacramento*, No. 2:18-cv-01150-TLN-KJN (E.D. Cal.) (settlement for claims that several deputies falsely arrested and "paraded" the handcuffed arrestees before releasing them without charges filed); *Rivera v. Cater*, No. 2:18-cv-00056-WBS-EFB (E.D. Cal.) (settlement for claims a deputy shot and killed a non-threatening, mentally ill man on the street); *Abbott v. County of Sacramento*, No. 2:17-cv-02698-WBS-EFB (E.D. Cal.) (settlement for claims that a deputy broke the detainee's foot and sprained his wrist during jail booking); *Augustine v. County of Sacramento*, No. 2:17-cv-02605-WBS-AC (E.D. Cal.) (settlement for claims that a deputy shot and killed a 17-year-old mentally ill boy who was cornered and holding a pocketknife to his own throat); *Ennis v. County of Sacramento*, No. 2:17-cv-02052-KJM-EFB (E.D. Cal.) (settlement for claims that a deputy broke the detainee's left wrist, after she had warned the deputy that her wrist had been previously injured); *Williams v. County of Sacramento*, No. 2:17-cv-01726-JAM-EFB (E.D. Cal.) (settlement for claims alleging that two deputies falsely arrested and employed excessive force against the arrestees); *Cain v. City of Sacramento*, No. 2:17-cv-00848-JAM-DB (E.D. Cal.) (settlement for claims that a deputies held the injured detainee face-down on the ground while forcibly stripping and verbally abusing him); *McCormack v. County of Sacramento*, No. 2:16-cv-01303-WBS-AC (E.D. Cal.) (settlement for claims that a deputy slammed the arrestee's head into a wall); *DeVard v. County of Sacramento*, No. 2:16-cv-00159-JAM-CKD (E.D. Cal.) (settlement for claims that a deputy was captured on a surveillance camera punching the arrestee in his face and slammed him into a patrol vehicle); *Shannon v. County of Sacramento*, No. 2:15-cv-00967-KJM-DB (E.D. Cal.) (settlement for claims that two deputies shot and killed a non-threatening man carrying airsoft replica weapons); *Aviña-Luna v. County of Sacramento*, No. 2:14-cv-01295-TLN-DAD (E.D. Cal.) (settlement for claims that a deputy broke the detainee's right arm while applying arm-hold during jail booking); *Salinas v. County of Sacramento*, No. 34-2013-00152323 (Sacramento Cnty. Super. Ct.) (settlement for claims that a deputy broke the detainee's right arm while applying arm-hold during jail booking); *Lundell v. County of Sacramento*, No. 2:12-cv-02832-MCE-AC (E.D. Cal.) (settlement for claims that a deputy broke the detainee's right arm while applying handcuffs during jail booking);

*Harmon v. County of Sacramento*, No. 2:12-cv-02758-TLN-AC (E.D. Cal.) (settlement for claims that deputies shot a non-threatening decedent with a taser then shot him 18 times, killing him); *Gonsalves v. County of Sacramento*, No. 2:11-cv-02506-WBS-DAD (E.D. Cal.) (settlement for claims that a detective went to a suspect's home and "sucker-punched" him, without provocation); *Abdallah v. County of Sacramento*, No. 2:11-cv-00625-MCE-KJN (E.D. Cal.) (settlement for claims that five deputies beat the non-threatening, mentally ill detainee into unconsciousness, causing a lacerated liver, multiple cracked ribs, a broken nose, and facial lacerations); *Duran v. County of Sacramento*, No. 2:10-cv-03301-GEB-GGH (E.D. Cal.) (settlement for claims that a deputy broke the detainee's left arm while applying arm-hold during jail booking); *Jaquez v. County of Sacramento*, No. 2:10-cv-01040-MCE-DAD (E.D. Cal.) (settlement for claims that deputies beat the arrestee, causing a fractured right elbow and leaving a boot-imprint on his face).

252.   <u>Training, Supervision, and Discipline</u>: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER only impose minimal, insignificant, and untimely discipline against personnel even when misconduct is documented and only issue discipline when misconduct is indisputable. For example, in addition to those incidents described above and incorporated herein:

(a)   On March 16, 2023, deputy Antero Reyes incorrectly attempted to move an inmate into the cell of another mentally-ill inmate who was assigned to total-separation ("T-Sep") housing at the Sacramento County Main Jail. The inmate informed the deputy about his housing status, to prevent the inmate from entering his cell and presenting a potential threat. In response, the deputy threatened the inmate, including stating: "You square up on me, we're going to fight"; "Back the fuck up"; "Don't be a bitch now"; and "Don't fucking square up on me, I'll fuck you up." The inmate asked Reyes if he was physically threatening him, to which deputy Reyes responded, "Yeah, let's go." The deputy assaulted the inmate, including punching him in the face four times in rapid succession. Another deputy present during the incident told deputy Reyes, "Chill, chill, chill," in attempt to stop the deputy-on-inmate assault. After the incident, deputy Reyes prepared a false report of the incident which attempted to justify his use of force and misrepresented the number of punches he utilized against the inmate. An investigation "sustained" the excessive force allegation. No. 2023PSD-0170. On June 13, 2023, captain Vanessa

Vaden recommended deputy Reyes be suspended for 40 hours. On June 20, 2023, chief deputy Dan Donelli recommended deputy Reyes be suspended for 40 hours. On July 26, 2023, Defendant JIM COOPER "affirmed" the proposed discipline.

(b)     On September 17, 2022, Salvador Garcia Jr. was subject to excessive force by Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's personnel, including deputies Dylan Black and Shea Lukes. Report No. 22-277217. The arrestee was riding his bicycle when he was accosted by deputy Black who ordered him to "stop." The arrestee turned his bike on the wet grass and slipped to the ground. The deputy deployed his police canine partner, Roscoe, which mauled the subject's right forearm. The arrestee screamed in pain, as the deputy unsuccessfully attempted to handcuff the subject's arms while the canine continued mauling his right arm. The deputy tried to handcuff the subject's right arm but could not get the canine to stop mauling on the arrestee's arm. Eventually, the deputy ripped the canine off of the arrestee's arm, further injuring him, as blood was spurting from the arm from where the arrestee sustained a severed artery. The arrestee was left lying on the ground bleeding from a severed artery, while deputy Lukes' failed to provide necessary medical care, including attempting to stop the bleeding from the arrestee's arm. The arrestee was hospitalized for several days and underwent reconstructive surgery as a result of the injuries sustained. The sheriff's department found the deputies' conduct to be within policy. A civil rights lawsuit was filed. *Garcia v. County of Sacramento*, No. 2:23-cv-00899-DAD-KJN (E.D. Cal.). The case was settled pretrial for $755,000.

(c)     On May 8, 2022, deputy Freddy Martinez conducted a traffic stop on a vehicle driven by Donald Burney. The detainee was experiencing a medical emergency and opened the door of his vehicle. The deputy observed that the detainee was "talking rapidly and somewhat incoherently," was "unsteady on his feet," and made "spontaneous hand movements." The deputy grabbed at the detainee to apply handcuffs to his arms but he fell forward, landing on the ground. The deputy handcuffed the detainee's arms behind his back. The deputy then "kept [the detainee] on the ground with [his] knee on top of [the detainee]'s lower back/hip area" using "weight on [the detainee]'s lower back/hip area…" The deputy confined the detainee to the back of his patrol vehicle and conducted a records research which revealed "[the detainee]'s diabetic history." The deputy asked the detainee if he was having a diabetic

30

emergency, to which the detainee responded, "Yes." The detainee had a diabetic monitor on his arm controlled by a cell phone application which "showed [the detainee]'s blood sugar was at 60." The detainee instructed the deputy to get candy from his vehicle, which raised his blood sugar to 90-to-100. The sheriff's department found the deputy's conduct to be within policy.

(d)     On August 1, 2021, Larry Weigle was involved in a vehicular pursuit that ended when he exited his vehicle and fled on foot. The arrestee was chased-down and pushed to the ground by deputy Shayn Bowen. Deputy Bowen mounted the subject and pulled his arms behind his back to apply handcuffs. The arrestee surrendered to deputy Bowen's efforts to arrest him and did not resist. Deputies Hunter Greenwood and Brittany Linde arrived on scene, shortly after the arrestee was taken to the ground. Deputy Greenwood ran towards the subdued arrestee and deputy Bowen. Deputy Greenwood yelled out, "Get him! Go!" Deputy Greenwood kicked the arrestee twice with his foot, including raising his foot and stomping on the arrestee's head. The arrestee was lying motionless and compliant on the ground with his arms behind his back, at the time that deputy Greenwood kicked and stomped him. Deputy Greenwood's stomp caused the arrestee's head to strike the ground, cutting his head. Deputies Bowen and Linde observed deputy Greenwood assault the arrestee, without justification or cause, but said and did nothing in response. Instead, deputy Linde created a false pretext for deputy Greenwood's assault, including by stating, "Give me your hand!" The arrestee responded, "You have it!" Then, deputy Linde stated, "Stop resisting!" The arrestee responded, "I'm not resisting!" Then, deputy Linde stated, "Relax!" The arrestee responded, "I'm relaxed!" Later that night, deputy Greenwood, a field training officer, discussed the incident with deputy Mark Hampton, his trainee. Deputy Greenwood briefly paused during the conversation with deputy Hampton to ask if he was "still hot"—*i.e.*, if deputy Hampton was currently recording their conversation with his body-worn camera. Deputy Hampton responded by touching his body-worn camera, believing that he had deactivated it, and stating, "No." Deputy Greenwood stated, "Make sure it's off." Deputy Greenwood believed that deputy Hampton had turned-off his body-worn camera but, by accident, he had not done so. Immediately thereafter, deputy Greenwood continued to discuss the incident, bragging: "I kaboomed him twice. Gave him the good ol' boot. I mean, he was pretty much done at that point. It wasn't, like—I didn't, like, curb stomp him. I just, like, threw him to the ground and kicked him on the torso once or twice." At the scene, deputy Linde

admitted to her supervisor, sergeant David Cueno, that deputy Greenwood kicked the arrestee. Deputy Linde also admitted that the deputies did not have sufficient evidence to charge the subject with violation of California Penal Code § 69. Sergeant Cueno, deputy Bowen, and deputy Linde each failed to report deputy Greenwood's use-of-force, as required by the sheriff's department's policy. Deputy Linde submitted a report falsely describing the incident, including: "[the arrestee] was actively resisting by keeping his right arm tucked under his body. . . . Deputy Greenwood #684 (unit 67F2) responded and assisted Deputy Bowen and I [*sic*] in placing [the arrestee] in handcuffs." Specifically, deputy Linde omitted from her report that deputy Greenwood had assaulted the arrestee by stomping him twice. The arrestee filed a citizen complaint. Report No. 2022PSD-0187. During the investigation of the complaint, deputy Linde admitted that she falsely reported the arrestee's hands were "tucked under his body" when, if fact, they were behind his back, and, "if someone's got their hands behind their back and [an officer] run[s] up and just kick[s] somebody," that that force is "not warranted." Sergeant Cueno was also found to have failed to report use-of-force incidents on multiple occasions, including in this case. On October 18, 2022, chief deputy Santos Ramos "recommended Deputy Greenwood receive a 40-hour suspension" and "recommended Sergeant Cueno receive a 20-hour suspension." On November 28, 2022, undersheriff James Barnes rejected the recommendations and "EXONERATED" deputy Greenwood. On December 7, 2022, Defendant JIM COOPER "affirmed" undersheriff Barnes' exoneration. On June 9, 2022, a civil rights lawsuit was filed. *Weigle v. County of Sacramento*, No. 2:22-cv-01000-MCE-JDP (E.D. Cal.). The case was settled pretrial for $175,000.

(e)    From December 7, 2020, through January 12, 2021, a deputy sheriff improperly accessed the sheriff's department's Jail Person Files ("JPF") information database at least 22 times, and Known Persons File ("KPF") information database at least three times, for personal and non-legitimate reasons. (The investigative search for the deputy's improper access was limited to the period from November 1, 2020, to January 12, 2021.) The deputy conducted the unauthorized inquiries to learn more about a suspect in the alleged assault of a family member. An anonymous citizen complaint was filed. Report No. 2020PSD-0661. The complaint was deemed "Unfounded." Chief deputy Leeannedra Marchese recommended that the deputy be suspended from his position as deputy sheriff for a period of 20 hours. On August 9, 2021, sheriff Scott Jones "deemed appropriate" the recommended discipline.

Subsequently, the deputy was involved in an officer-involved death incident where he and fellow deputies smothered a mentally-ill Black man to death. *Estate of Stingley v. County of Sacramento*, No. 2:23-cv-00255-TLN-AC (E.D. Cal.).

(f)     On March 10, 2020, deputy Spencer Wright was a "ride-along" participant with a Post-Release Community Supervision ("PRCS") joint task force. Deputies conducted a traffic stop on a vehicle driven by Brandell Sampson. The detainee was directed to exit his vehicle and to walk backwards with his hands on his head, and he complied. The deputy approached the detainee from behind and deployed a taser against him, without justification. Then, the deputy jumped and kicked the detainee in his back. The detainee fell to the ground. Then, the deputy struck the detainee three time on his head with the butt of the taser handle. An investigation "sustained" the excessive force allegations. Report No. 2020PSD-0149. On July 6, 2020, captain James Barnes recommended an 80-hour suspension. On July 10, 2020, chief deputy Chet Madison recommended an 80-hour suspension. On July 30, 2020, undersheriff Erik Maness recommended an 80-hour suspension. On August 20, 2020, sheriff Scott Jones "affirmed" the proposed discipline.

(g)     On February 6, 2020, multiple deputies, including sergeant Brannon Polete and deputy Kyle Zimmerman, entered the private garage of a subject, grabbed him, and tackled him to the ground. The deputies made disparaging remarks to the subject, including calling him a "motherfucker." Sergeant Polete instructed the subject to "Say you're fucking sorry," then, when the subject did so, stated, "You are sorry, motherfucker. I am the sergeant. You're a drunk little fuck. You are going to go to jail and you will be fucking pussy in jail." When the subject asked, "What is my crime?," sergeant Polete responded, "Because you're a fucking asshole." The deputies grinned and fist-bumped with sergeant Polete after assaulting the subject, demonstrating a "celebratory" demeanor. Deputy Zimmerman attempted to mute the microphone on his belt during these interactions, in attempt to cover-up the deputies' misconduct. (Later, deputy Zimmerman lied to investigators about his ignorance related to the belt microphone functionality.) A deputy unplugged a cord connected to a surveillance camera in the subject's garage, in attempt to cover-up the deputies' misconduct. An investigation "sustained" the misconduct allegations. Report No. 2020PSD-0057. On March 30, 2020, captain Todd Henry recommended no discipline for some deputies, a 10-hour suspension for the deputy that unplugged the

surveillance camera, termination of deputy Zimmerman, and demotion of sergeant Polete—based on the officers' histories of misconduct in this case and others. On April 20, 2020, chief deputy Chet Madison recommended no discipline for some deputies, a 20-hour suspension for the deputy that unplugged the surveillance camera, termination of deputy Zimmerman, and termination of sergeant Polete. On May 8, 2020, undersheriff Erik Maness recommended the 120-hour suspension of deputy Zimmerman, and the 160-hour suspension and demotion of sergeant Polete. On June 15, 2020, sheriff Scott Jones "concur[red]" with the proposed discipline.

(h)      On August 25, 2019, deputy Andrew Seidel and fellow deputies applied a WRAP restraint device to a mentally-ill inmate at the Sacramento County Main Jail. After the inmate was taken to the ground in a prone position, deputy Seidel used his knee to strike the inmate in the head, without justification. Deputy Seidel prepared a false report which omitted the excessive force used against the inmate. An investigation "sustained" the excessive force allegation. Report No. 2019PSD-0543. On April 7, 2020, chief deputy Santos Ramos recommended issuance of a "letter of reprimand." On April 20, 2020, captain Charles Meeks issued a "letter of reprimand." On April 22, 2020, sheriff Scott Jones "affirmed" the proposed discipline.

(i)      On May 17, 2019, deputy Daren Allbee falsely detained and towed the vehicle of a homeless advocate in retaliation for her participation in a demonstration. The deputy had an extensive history of misconduct, including being named as a party-defendant in at least six lawsuits. *See Wilkes v. Sacramento Sheriff*, No. 2:02-cv-00952-MCE-DAD (E.D. Cal.); *Bellinger v. Allbee*, No. 2:02-cv-02335-LKK-GGH (E.D. Cal.); *Craver v. Sacramento County*, No. 2:03-cv-01979-GEB-EFB (E.D. Cal.); *Walker v. Allbee*, No. 2:04-cv-02075-LKK-DAD (E.D. Cal.); *Wimberly v. County of Sacramento*, No. 2:06-cv-00289-JAM-GGH (E.D. Cal.); *Smith v. Albee*, No. 2:15-cv-01598-JAM-KJN (E.D. Cal.). Additionally, the deputy had been the repeated subject of sustained internal affairs investigations, including in December 2004, a brief "suspension" for excessive force against a jail inmate; in April 2007, a second brief "suspension" for improper contact with a witness and engaged in inappropriate and prohibited relations with that witness; and in September 2013, a "reprimand" for reckless operation of a patrol vehicle causing an accident and property damage. Further, the deputy was accused of rape by a woman in family court filings in 2007, and had his wages garnished by the sheriff's department on

34

multiple occasions. Despite his personnel history, the deputy remained employed and was promoted from corrections to patrol by the sheriff's department. A civil rights lawsuit was filed. *Sanchez v. County of Sacramento*, No. 2:19-cv-01545-MCE-AC (E.D. Cal.). The case was settled pretrial.

(j)      Beginning in May 2019, a deputy repeatedly sent threatening and inappropriate emails to Rachael Rendon at her work-related email address, where she was employed as a parole officer by the California Department of Corrections and Rehabilitation ("CDCR"). The subject was the girlfriend of the deputy's ex-boyfriend, Chris. For example, the deputy threatened the subject that she would "contact your appropriate chain of command" (the deputy previously worked for the CDCR) and that she had an ongoing relationship with Chris. The deputy's harassing emails caused the subject to fear for her safety and the safety of her children and family. The subject made repeated and unsuccessful requests for the deputy to cease her contacts. The deputy also abused her access to the Sacramento County Sheriff's Department's Known Persons File ("KPF") information database to view confidential information about the subject and her family members, for personal and non-legitimate reasons. The subject obtained a civil restraining order against the deputy which prohibited her ability to possess personal and department-issued firearms for one month. The subject's petition for restraining order identified the deputy's previous history of physical assault and stalking. Sacramento County Superior Court, Case No. 34-2019-7006482. The subject also filed a police report with the Folsom Police Department. Report No. 19-093101148. The subject also filed a citizen complaint. Report No. 2019PSD-0520. Captain James Barnes recommended that the deputy "be suspended from [her] position as Deputy Sheriff for a period of forty-eight (48) hours." On February 26, 2020, sheriff Scott Jones "deemed appropriate" the recommended discipline. Subsequently, the deputy was involved in an excessive force incident where she lied about a fellow officer kicking an arrestee in the head, *Weigle v. County of Sacramento*, No. 2:22-cv-01000-MCE-JDP (E.D. Cal.), and an officer-involved death incident where she and fellow deputies smothered a mentally-ill Black man to death, *Estate of Stingley v. County of Sacramento*, No. 2:23-cv-00255-TLN-AC (E.D. Cal.).

(k)      On May 20, 2018, a deputy stalked and confronted Wendy McElroy in a coffee shop, told her that she was a deputy sheriff, and threatened to assault and kill her. The deputy was engaged in an ongoing affair with the subject's husband at the time of the assault and threats. The subject

filed a citizen complaint. Report No. 2018PSD-273. Captain Matt Petersen recommended that the deputy "receive a Documented Counseling to remain in her personnel file for a period of six (6) months." On November 7, 2018, a documented counseling was placed in the deputy's file for six months. Subsequently, the deputy was involved in an excessive force incident where she lied about a fellow officer kicking an arrestee in the head, *Weigle v. County of Sacramento*, No. 2:22-cv-01000-MCE-JDP (E.D. Cal.), and an officer-involved death incident where she and fellow deputies smothered a mentally-ill Black man to death, *Estate of Stingley v. County of Sacramento*, No. 2:23-cv-00255-TLN-AC (E.D. Cal.).

(l)     On April 11, 2018, deputy Daniel Garcia slammed a mentally-ill inmate against the wall causing a cut to the inmate's lip at the Sacramento County Main Jail. Deputy Garcia did not provide medical attention to the inmate for the injury he caused. An investigation "sustained" the excessive force allegation, and found that the deputy lied in his report and during his interview when he falsely stated that the inmate made a furtive or threatening movement necessitating the assault. Report No. 2018PSD-245. On August 30, 2018, captain Eric Buehler recommended the deputy be suspended for 10 hours. On September 14, 2018, chief deputy Jennifer Freeworth recommended the deputy be suspended for 10 hours. On November 15, 2018, sheriff Scott Jones "affirmed" the proposed discipline.

(m)     On January 8, 2017, deputy Daniel Brown was startled by mental health inmate, Cantrarutti, when he punched his cell door at the Sacramento County Main Jail. The inmate laughed, when the deputy become startled. The deputy was embarrassed and retaliated against the inmate, including by removing him from his cell, tackling him to the ground and punching him, along with several other deputies. An investigation "sustained" the excessive force allegation and found that "the use of force should have never occurred in the first place." Report No. 2017PSD-054. On March 30, 2017, captain Eric Buehler recommended the deputy be suspended for 10 hours. On April 7, 2017, chief deputy David Torgerson recommended the deputy be suspended for 10 hours. On July 7, 2017, sheriff Scott Jones "affirmed" the proposed discipline.

(n)     On September 27, 2016, a deputy was involved in an excessive force incident which was recorded on video where an inmate, Monful, was tackled to the ground by the deputy at the Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No.

1    2016PSB-530. The only discipline imposed against the deputy was issuance of a 48-hour suspension.

2        (o)    On May 18, 2016, three deputies were involved in an excessive force incident

3    which was recorded on video where an inmate, Roshawn Jackson, was slammed to the ground and had

4    his arms twisted by the deputies at the Sacramento County Main Jail. An investigation "sustained" the

5    excessive force allegation. Report No. 201PSB-212. The only discipline imposed against the deputies

6    was issuance of an 80-hour suspension.

7        (p)    On November 21, 2015, a deputy was involved in an excessive force incident

8    which was recorded on video where an inmate, Yasir Mehmood, was punched and kicked by a deputy

9    while he was defenseless and handcuffed at the Sacramento County Main Jail. An investigation

10   "sustained" the excessive force allegation. Report No. 2015IA-034. The only discipline imposed against

11   the deputy was issuance of a "letter of reprimand."

12       (q)    On July 6, 2015, a deputy was involved in an excessive force incident which was

13   recorded on video where an inmate, Michael McCormick, was grabbed by the neck, choked, and

14   slammed against a wall by a deputy at the Sacramento County Main Jail. An investigation "sustained"

15   the excessive force allegation. Sacramento County Sheriff's Department, Professional Standards Division

16   No. 201PSB-029. The only discipline imposed was issuance of a "letter of reprimand" and loss of

17   "training officer" status.

18       (r)    On June 5, 2015, six deputies were involved in an excessive force incident which

19   was recorded on video where an inmate, Deshaun Williams, was slammed to the ground and had his arms

20   and legs twisted by deputies at the Rio Cosumnes Correctional Center. An investigation "sustained" the

21   excessive force allegation. Report No. 2015IA-025. The only discipline imposed against the deputies was

22   issuance of a "documented counseling" and "letter of reprimand."

23       (s)    On January 28, 2015, a deputy was involved in an excessive force incident which

24   was recorded on video where an inmate, Kelly Brown, had his head stomped by a deputy at the

25   Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No.

26   2015IA-005. The only discipline imposed against the deputy was issuance of a "letter of reprimand."

27       (t)    On October 14, 2014, a deputy was involved in an excessive force incident which

28   was recorded on video where an inmate, Andrew Moras, was slammed to the ground by the deputy at the

37

Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No. 2014IA-046. The only discipline imposed against the deputy was issuance of a 48-hour suspension.

(u)     On July 25, 2014, three deputies were involved in an excessive force incident which was recorded on video where an inmate, Jordan Fagan, was slammed to the ground by deputies at the Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No. 2014IA-041. The only discipline imposed against the deputies was issuance of a "documented counseling."

(v)     On May 24, 2014, a deputy was involved in an excessive force incident which was recorded on video where an inmate, Barnard Jones, was pepper-sprayed by a deputy at the Rio Cosumnes Correctional Center. An investigation "sustained" the excessive force allegation. Report No. 2014IA-028. The only discipline imposed against the deputy was issuance of a one-step reduction in salary for 26 pay-periods.

(w)     On April 25, 2014, four deputies were involved in an excessive force incident which was recorded on video where an inmate, Edward Deed, was punched and kicked by the deputies at the Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No. 2013IA-032. The only discipline imposed against the deputies was issuance of a "letter of reprimand."

(x)     On August 20, 2013, a deputy was involved in an excessive force incident which was recorded on video where an inmate, Melanie Orantes, was punched in the head by the deputy at the Sacramento County Main Jail. An investigation "sustained" the excessive force allegation. Report No. 2013IA-043. The only discipline imposed against the deputy was issuance of a "letter of reprimand."

(y)     In 2013, a deputy was involved in an excessive force incident which was recorded on video where an inmate, Sundy Vongkhamsomphouwas, was kicked by the deputy at the Rio Cosumnes Correctional Center. An investigation "sustained" the excessive force allegation. Report No. 2013IA-039. The only discipline imposed against the deputy was issuance of a two-day suspension.

253.    <u>Inadequate Medical Care</u>: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER knowingly participated in, acquiesced to, and/or were deliberately indifferent to the creation and maintenance of a policy or custom whereby

38

personnel inadequately summon, procure, and/or provide care for inmates, including failure to respond to immediate medical needs. For example:

(a)    The *Mays* consent decree monitoring reports of the medical experts describe and document numerous, persistent, and ongoing incidents and case reviews where jail staff, including custody and medical staff, failed timely to observe and respond to inmates' immediate medical needs at jail facilities. *See, e.g.*, *Mays v. County of Sacramento*, No. 2:18-cv-02081-TLN-CSK, ECF No. 136-1 (E.D. Cal. Jan. 20, 2021), ECF No. 149-1 (E.D. Cal. Oct. 4, 2021), ECF No. 162-1 (E.D. Cal. Oct. 25, 2022), ECF No. 168-1 (E.D. Cal. Aug. 15, 2023), ECF No. 180-1 (E.D. Cal. July 16, 2024), ECF No. 197-1 (E.D. Cal. Jan. 27, 2025). Each of these monitoring reports and the incidents described therein are expressly incorporated herein.

(b)    On May 12, 2024, 55-year-old inmate David Barefield died while in medical distress during the booking process at the jail carried out by Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's personnel, including deputies David Godwin, Matthew Blanco, and Lewis. The decedent was brought to the jail for booking while experiencing severe symptoms of overdose, including loss of consciousness and inability to stand or communicate. The deputies ignored the decedent's medical distress and loaded the decedent into a cart where he defecated himself. A jail supervisor watched as the deputies dumped the decedent from the cart and dragged the semi-conscious decedent through the booking process, including lifting the decedent's limp head by his hair to take booking photos and holding him up by his lifeless arm to scan fingerprints. While doing so, the deputies ignored the decedent's pleas for help and smiled, joked, and laughed about the decedent's state of distress as he died in their arms. A civil rights lawsuit was filed. *Estate of Barefield v. County of Sacramento*, No. 2:24-cv-03427-TLN-JDP (E.D. Cal.). The case settled pretrial for $3,500,000. The *Mays* consent decree monitors issued a report critiquing jail personnel's actions: "Review of his medical record and of video showed the conduct of … Sacramento Sheriff's Office (SSO) deputies was egregious, shocking, and demonstrated callous disregard for the patient's serious medical condition. Actions and omissions by staff directly contributed to his death. . . . SSO deputies who began the booking process *failed to recognize the seriousness of the patient's condition demonstrated by his inability to participate in any booking processes. Instead, they dragged him through the booking process*

*as his condition deteriorated. At the point it became clear that the patient had an altered level of consciousness and was unable to stand or participate in the booking process, deputies should have immediately notified a nurse. . . .* The patient was entitled to timely medical care, dignity, and respect by … SSO deputies; he received none of these. With timely care, his death may have been preventable. . . . SSO deputies did not alert medical staff of the patient's condition and demand reevaluation of the patient[.]" *Mays*, *supra*, ECF No. 197-1 at 143–145 (E.D. Cal. Jan. 27, 2025).

(c)      On May 5, 2024, 45-year-old inmate Lope Tolosa died at the Sacramento County Jail. Three days earlier, the decedent was admitted to the jail intoxicated and detoxification housing was ordered. The medical staff did not medically evaluate the decedent for withdrawal treatment at any time prior to his death. Nine hours after admission, the nurse who was to conduct withdrawal monitoring made no attempt to locate the decedent. The decedent was found minimally responsive inside of his cell by a deputy. In response, the deputy went to another floor of the jail, found a nurse, and told the nurse that the decedent needed medical attention. But the nurse did not respond to the decedent's location and instead told the deputy to call downstairs. The decedent died. The *Mays* medical expert monitors described the incident as follows: "In summary, this case represents a failure to medically evaluate, treat, and monitor the patient who was at risk for alcohol withdrawal and death. It also represents a failure of emergency response. In the mortality review, the Medical Director did not include key system and individual performance issues that needed to be addressed. This fails to meet the requirements of the Consent Decree, and this death may have been preventable." *Mays*, *supra*, ECF No. 197-1 at 140–142 (E.D. Cal. Jan. 27, 2025).

(d)      On July 8, 2023, 43-year-old inmate Michael Prince died at the Sacramento County Jail. On July 2, 2023, the decedent was admitted to the jail with a medical history including serious mental illness; noncompliance with medications; neuropathy, peripheral due to diabetes; diabetes mellitus, type 2; elevated blood pressure reading without diagnosis of hypertension; diabetic peripheral neuropathy; body aches; alcohol use disorder; anxiety state, unspecified; bipolar disorder; FOSS III; tested positive for COVID-19; heroin abuse; alcohol abuse; and benzodiazepine withdrawal. From July 2, 2023, to July 8, 2023, jail staff failed adequately to house, monitor, and respond to the decedent's obvious and deteriorating medical condition. On July 8, 2023, deputy Justin Smith performed a safety

40

check on the decedent's cell. The deputy observed the decedent's unconscious body in an abnormal position "kneeling" against the bunk in the cell. The decedent was experiencing a medical emergency from ingesting a fatal quantity of fentanyl and had vomit on his face and mattress and snot running out of his nose. The deputy asked through the cell door, "He alright?," but received no response. The walked away from the cell, without receiving a response or determining whether the decedent required medical attention. The deputy's interaction at door of the cell lasted approximately three seconds. Later, the decedent was found dead in the cell. A civil rights lawsuit was filed. *Estate of Prince v. County of Sacramento*, No. 2:24-cv-00992-KJM-JDP (E.D. Cal.). The case remains pending. The *Mays* medical expert monitors found: "[R]ecord review showed that for one patient housed on the detox unit, nurses did not conduct any withdrawal monitoring during the six days prior to his death."; and "On 7/2/2023, a patient was admitted to the detox unit with alcohol and opioid substance use disorder but nurses did not monitor the patient for the six days the patient was in the unit. The patient died on the morning of 7/8/2023." *Mays*, *supra*, ECF No. 168-1 at 15 (E.D. Cal. Aug. 15, 2023).

(e)    On July 20, 2023, 37-year-old inmate Cody Catanzarite died at the Sacramento County Jail. The decedent was admitted and booked into detoxification housing after reporting that he had ingested fentanyl, and he had a history of fentanyl use and alcohol consumption. The intake nurse did not issue routine orders, such as alcohol/opioid withdrawal monitoring, detox medication regimens, or urgent referral to a medical provider. The next day, the decedent went into cardiac arrest and died of a drug overdose. A civil rights lawsuit was filed. *Estate of Catanzarite v. County of Sacramento*, No. 2:24-cv-01123-DAD-CKD (E.D. Cal.). The case remains pending. The *Mays* medical expert monitors found: "concerns are that after Tier 1 screening, the patient was taken out of the booking loop for processing by custody before Tier 2 medical screening was conducted. In the 5.5 hours before a nurse saw the patient, his COWS score increased from 1 to 9. Given his history of fentanyl and alcohol substance use disorder, starting the patient on opioid and alcohol detox regimens needed to be considered, however because Tier 2 screening was delayed, it was not." *Mays*, *supra*, ECF No. 168-1 at 142 (E.D. Cal. Aug. 15, 2023).

(f)    On May 27, 2023, 47-year-old inmate Norman Fisher Jr. died of "septic shock," "Klebsiella bacteremia," "pneumonia," and "non-traumatic acute kidney failure" at the Sacramento County Jail. The decedent's health significantly deteriorated over the course of several weeks, without

41

intervention by jail staff. The decedent's fellow inmates, including his cellmate and floor trustee, attempted to obtain care for the decedent on several occasions, without avail. The custody staff discouraged complaints and the medical staff failed to address the decedent's immediate medical needs. The jail staff were deliberately indifferent to the decedent's escalating symptoms and complaints throughout May 2023, until he died on May 27, 2023. A civil rights lawsuit was filed. *Estate of Fisher v. County of Sacramento*, No. 2:24-cv-00109-DAD-DB (E.D. Cal.). The case was settled pre-trial for $1,300,000. The *Mays* medical expert monitors found "critical lapses of care" and that "[the decedent] needed to be sent to the [emergency department] much earlier." *Mays*, *supra*, ECF No. 180-1 at 106–108 (E.D. Cal. July 16, 2024).

(g)     On April 5, 2023, 35-year-old inmate Delion Johnson died of an overdose at the Sacramento County Jail. The decedent was inadequately searched and monitored by jail staff upon intake, who failed to detect a "golf-ball sized" baggie of pills in the decedent's jacket. Inside a holding cell, the decedent distributed and ingested drugs over the course of several hours, within sight of an in-cell surveillance camera which was unmonitored by several on-duty custody staff, and as jail staff walked by but failed to look into the cell while conducting "safety checks." Eventually, the decedent lost consciousness and passed out inside of the cell. The decedent medical emergency was undetected or ignored for more than three hours, as several jail staff members walked by the cell, without observing or checking on the decedent. Eventually, an inmate worker alerted a jail staff member to the decedent's condition and the decedent was located and pronounced dead. A civil rights lawsuit was filed. *Estate of Johnson v. County of Sacramento*, No. 2:23-cv-01304-KJM-JDP (E.D. Cal.). The case remains pending.

(h)     On February 15, 2022, 37-year-old inmate Anthony Galley suffered a seizure caused by severe alcohol withdrawal and died at the Sacramento County Main Jail. On February 13, 2022, the decedent was admitted into the jail while intoxicated with a medical history of alcohol use disorder and addiction. The jail staff failed to utilize or implement necessary alcohol detoxification protocols, confined the decedent to a holding cell without adequate monitoring, and ignored him until he was found unresponsive and died. A civil rights lawsuit was filed. *Galley v. County of Sacramento*, No. 2:23-cv-00325-WBS-AC (E.D. Cal.). The case remains pending. *Mays*, *supra*, ECF No. 153-4; *Mays*, *supra*, ECF No. 162-1 at 76.

(i)    On September 26, 2021, 44-year-old inmate Anthony Cravotta II was beaten into a coma and suffered a traumatic brain injury at the Sacramento County Main Jail. The decedent was a mentally ill inmate declared incompetent to stand trial (IST) and awaiting transfer to a state hospital for restorative treatment. The custody staff assigned the decedent (a white inmate) to share a cell with Lemar Burleson (a Black inmate), another mentally ill inmate, who had an extensive history of violence, including housing in total separation ("T-Sep") housing in isolation from other inmates due to assaultive conduct and documented threats: "said he wanted to kill white people"; "says will assault any cellmates he has"; "Threats to assault anyone he is celled with"; "threatened to assault any inmate he is housed with"; and "said he would assault any inmate he gets." On September 24, 2021, one day after the decedent and Burleson were housed together, a jail staff member reported a conversation with the decedent: "he got a new cellmate but 'It's not working out too well'" and "said 'if he gets physical I'll have to defend myself.'" On September 26, 2021, Burleson attacked the decedent inside their cell, including striking the decedent several times in the head and face with a "blunt" object. The decedent lay bleeding and struggling to breathe on the floor of the cell. A custody staff member failed to look into the cell and discover the decedent during his "safety check." Multiple streams of the decedent's blood began to leak from underneath the cell's door into the jail's dayroom which were visible on the jail's closed-circuit television (CCTV) surveillance system but custody staff responsible for monitoring the video feed failed to observe or detect the visible blood streams. More than 22 minutes after the blood streams were visible on the jail's CCTV surveillance system, and about 55 minutes after the last "safety check" by custody staff, an inmate-trustee noticed the streams of blood leaking from under the door of cell, approached the cell for inspection, and observed the decedent lying on the ground. In response, Burleson pressed the emergency button inside of his cell and reported to custody staff that he "might have killed" his cellmate. The custody staff responding to the scene left the decedent lying and struggling to breathe on the ground for several minutes, without attempting to stop the bleeding or placing him into a recovery position. A civil rights lawsuit was filed. *Cravotta v. County of Sacramento*, No. 2:22-cv-00167-DJC-AC (E.D. Cal.). The case remains pending.

(j)    On July 24, 2021, inmate Timothy Noble died while withdrawing from opiates at the Sacramento County Main Jail. Days earlier, the decedent was booked into the jail and began

receiving treatment for opiate withdrawal. The jail staff did not provide the decedent with special housing or monitoring. The decedent's cellmate observed that the decedent did not eat or drink for two days prior to his death but jail staff did not. The decedent was found dead in his cell. Report No. 2021-224861; <https://www.sacda.org/wp-content/uploads/2022/10/ICD-Noble-2021-.pdf>.

(k)     On August 4, 2020, inmate Travis Welde overdosed at the Sacramento County Main Jail, and died of "hemopericardium due to a ruptured acute myocardial infarction resulting from mixed drug intoxication." Days earlier, the decedent was booked into the jail and participated in a medical screening exam where the nurse concluded he was "fit for incarceration." The decedent's urine drug screening test was positive for amphetamines, methamphetamines, THC, MDMA, and opiates. The decedent was "engaging in erratic behavior, such as kicking his door and talking nonsensically." On August 2, 2020, the decedent was transferred to the mental health housing unit and his condition continued to deteriorate, including "smear[ing] feces on himself and his cell walls," "talking to himself" and "yelling unintelligibly," "sweating" or appearing "wet," "flail[ing] his arms," and "sit[ting] and stand[ing] back up repeatedly." On August 3, 2020, The decedent told staff that he was "detoxing." The jail staff ignored that the decedent was detoxing because "nursing staff believed [the decedent] was outside the time period for detoxing from drug use due to the length of time [the decedent] had been in the jail." Later, the jail's mental health staff concluded that the decedent was "gravely disabled" and he was "placed him on the waiting list for a higher level of mental health care." On August 4, 2020, the decedent was "standing naked at the cell door," "breathing heavily," and "bouncing back and forth on the balls of his feet." The jail staff asked the decedent if he was okay and, in response, he "grunted and shook his head." The jail staff continued to ignore the decedent. An hour later, the decedent was found lying "face down and naked" on the floor. The jail staff continued to ignore the decedent. Later, jail staff entered the cell and determined that the decedent was not breathing and had no pulse. Report No. 2020-248721; <https://www.sacda.org/wp-content/uploads/2022/10/ICD-Review-Welde-.pdf>.

(l)     On July 19, 2019, inmate Nicholas Overbey was found dead inside of his cell at the Sacramento County Main Jail. The decedent was assigned to the jail's special housing but was ignored and unmonitored by the jail staff. The decedent's cellmate pressed the emergency call button located inside of the cell and informed jail staff that the decedent was not breathing. The jail staff

responded and found the decedent lying on his back foaming at the mouth. The jail staff rubbed the decedent's sternum causing blood and other fluids to expel from his nose and mouth. The decedent's cellmate reported that he "had not been moving for at least a day." Report No. 2019-255337; <https://www.sacda.org/wp-content/uploads/2022/04/ICD-Overbey.pdf>.

(m)　　On July 8, 2019, 33-year-old inmate Bryan Debbs was beaten, stabbed, and choked during a nearly 30-minute continuous assault by cellmate Christian Ento at the Sacramento County Main Jail, and later died of "complications of neck compression." Days earlier, the decedent and Ento were classified by jail staff as "gravely disabled" as housed together in a continuously video-monitored cell. The jail staff failed to observe the monitor the inmates in their cell, as Ento assaulted the decedent. A civil rights lawsuit was filed. *Estate of Debbs v. County of Sacramento*, No. 2:20-cv-01153-TLN-DB (E.D. Cal.). The case settled pretrial for $1,200,000.

(n)　　On June 11, 2019, inmate Andrew Armstead overdosed at the Sacramento County Main Jail, and died of "methamphetamine intoxication." The decedent was booked into the jail and participated in a medical screening exam where the nurse concluded he was "fit for incarceration." A day after booking, the decedent was summoned for a classification interview but failed to appear. Later, the jail staff observed the decedent non-responsive inside of his cell on a bunk. Later, the decedent's cellmate pressed the emergency intercom button inside the cell and reported that the decedent was non-responsive. Later, the jail staff responded to the cell and observed that the decedent had no pulse and had died. The decedent's blood was found to contain amphetamine and methamphetamine. Report No. 2019-204534; <https://www.sacda.org/wp-content/uploads/2022/04/ICD-Armstead.pdf>.

254.　Discipline Records: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER violated Senate Bill 1421, a state law requiring disclosure of documents about misconduct or significant force by personnel. *See* Cal. Pen. Code § 832.7. Media organizations were forced to sue Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT and sheriff Scott Jones, in order to compel compliance with state law. *Sacramento Bee, L.A. Times Sue Sacramento County Sheriff's Department Over Release of Deputy Misconduct Records* (Jan. 25, 2019), available at: <https://ktla.com/news/local-news/sacramento-l-a-times-sue-sacramento-county-sheriffs-department-over-release-of-deputy-

misconduct-records/>. Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT was ordered to "pay more than $100,000 in legal fees to The Sacramento Bee and the Los Angeles Times in its court fight to hold onto deputies' discipline records…" The Sacramento Bee, *Sacramento sheriff must pay legal tab on discipline files* (Oct 9, 2019), available at: <https://sacbee.com/article235968547.html>.

255.    Investigation Delays: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER unreasonably delay investigations and administrative findings in officer-involved misconduct incidents of personnel, including for several years in some cases. For example, Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's backlog of misconduct investigations involves incidents occurring several years ago, including on September 17, 2018 (officer-involved shooting), January 19, 2021 (officer-involved shooting), December 24, 2021 (officer-involved shooting), October 18, 2022 (officer-involved shooting), November 19, 2022 (use of force), January 8, 2023 (use of force), January 14, 2023 (use of force), and February 22, 2023 (use of force). <https://www.sacsheriff.com/pages/released_cases.php>. Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER's failure timely to investigate and render findings in officer-involved incidents constitutes a violation of Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT's policies and procedures for timely investigations, renders any determination of personnel culpability ineffective due to the period of time between when the incident occurred and when discipline or corrective action can be taken, and perpetuates a culture of impunity and unaccountability.

256.    Obviousness: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER were or should have been on notice regarding the need to discontinue, modify, or implement new and different versions of the deficient policies or customs because the inadequacies were so obvious and likely to result in violations of rights of persons coming into contact with their subordinates, including Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

257.    Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER were aware of numerous incidents of their personnel's excessive and unreasonable uses-of-force, including those incidents described above, but repeatedly refused or

46

failed to take appropriate corrective action, including discipline, re-training, and/or implementation of changes to policies or procedures.

258.    Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER's inadequate policies, procedures, and training did proximately cause violation of rights of persons coming into contact with personnel, including the officer-involved injury of Plaintiff OURANIA THIMMHARDY.

## FIRST CLAIM

### Excessive Force

### (U.S. Const. Amend. IV; 42 U.S.C. § 1983)

259.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

260.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

261.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 used—or, were integral participants to or failed to intervene in—unreasonable and excessive force against Plaintiff OURANIA THIMMHARDY, in violation of the Fourth Amendment to the United States Constitution.

262.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, in violation of the Fourth Amendment to the United States Constitution.

263.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to rights, or were wantonly or oppressively done.

264.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and

47

1  inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF

2  SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER,

3  MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against

4  Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

5      WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

6  **SECOND CLAIM**

7  **Unreasonable Post-Arrest Care**

8  **(U.S. Const. Amend. IV; 42 U.S.C. § 1983)**

9      265.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY

10  OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER

11  MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

12      266.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the

13  extent relevant and as if fully set forth in this Claim.

14      267.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4,

15  and DOE 5 inadequately supervised, monitored, and responded to Plaintiff OURANIA THIMMHARDY,

16  putting her at substantial risk of suffering serious harm, without taking reasonable available measures to

17  abate that risk, where a reasonable official in the circumstances would have appreciated the high degree

18  of risk involved, in violation of the Fourth Amendment to the United States Constitution.

19      268.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO,

20  SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or

21  customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, in violation of

22  the Fourth Amendment to the United States Constitution.

23      269.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and

24  DOE 5's actions and inactions were motivated by evil motive or intent, involved reckless or callous

25  indifference to constitutional rights, or were wantonly or oppressively done.

26      270.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of

27  Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT,

28  JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and

48

1  inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF

2  SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER,

3  MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against

4  Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

5      WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

6                                **THIRD CLAIM**

7                                **Retaliation**

8                    **(U.S. Const. Amend. I; 42 U.S.C. § 1983)**

9      271.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendant MATTHEW

10  GURICH, DOE 1, DOE 2, and DOE 3.

11      272.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the

12  extent relevant, as if fully set forth in this Claim.

13      273.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3

14  retaliated against Plaintiff OURANIA THIMMHARDY for engaging in constitutionally protected

15  activity with intent to inhibit that activity, in violation of the First Amendment to the United States

16  Constitution.

17      274.    Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3's actions and inactions

18  were motivated by evil motive or intent, involved reckless or callous indifference to protected rights, or

19  were wantonly or oppressively done.

20      275.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of

21  Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3's actions and inactions, entitling her to

22  receive compensatory and nominal damages against Defendants MATTHEW GURICH, DOE 1, DOE 2,

23  and DOE 3; and punitive damages against Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE

24  3.

25      WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

26  \ \ \

27  \ \ \

28  \ \ \

                                        49

## FOURTH CLAIM

### Title II of the Americans with Disabilities Act

### (42 U.S.C. § 12101, *et seq.*)

276.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT.

277.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

278.    Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT qualify as a "public entity" within the meaning of 42 U.S.C. § 12131(1)(A) and 28 C.F.R. § 35.104. Plaintiff OURANIA THIMMHARDY had an impairment that substantially limited one or more major life activities and had a record of such an impairment.

279.    *Vicarious Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 failed reasonably to accommodate Plaintiff OURANIA THIMMHARDY's disability, where a reasonable accommodation was available, including by, *inter alia*, refraining from retaliation and using excessive force against Plaintiff OURANIA THIMMHARDY; timely summoning medical care for Plaintiff OURANIA THIMMHARDY; transporting Plaintiff OURANIA THIMMHARDY to a hospital or facility that could provide necessary medical care or treatment; and/or timely responding to Plaintiff OURANIA THIMMHARDY based on an immediate medical need, with deliberate indifference or reckless disregard, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

280.    *Municipal /Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, with deliberate indifference or reckless disregard, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

281.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF

SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

## FIFTH CLAIM

### § 504 of the Rehabilitation Act

### (29 U.S.C. § 701, *et seq.*)

282.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT.

283.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

284.    Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT qualify as a "public entity" within the meaning of 42 U.S.C. § 12131(1)(A) and 28 C.F.R. § 35.104, and receive federal financial assistance. Plaintiff OURANIA THIMMHARDY had an impairment that substantially limited one or more major life activities and had a record of such an impairment.

285.    *Vicarious Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 failed reasonably to accommodate Plaintiff OURANIA THIMMHARDY's disability, where a reasonable accommodation was available, including by, *inter alia*, refraining from retaliation and using excessive force against Plaintiff OURANIA THIMMHARDY; timely summoning medical care for Plaintiff OURANIA THIMMHARDY; transporting Plaintiff OURANIA THIMMHARDY to a hospital or facility that could provide necessary medical care or treatment; and/or timely responding to Plaintiff OURANIA THIMMHARDY based on an immediate medical need, with deliberate indifference or reckless disregard, in violation of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

286.    *Municipal /Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, with deliberate indifference or reckless disregard, in violation of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

287.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of

51

Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

### SIXTH CLAIM

**Excessive Force**

**(Cal. Const. Art. I § 13)**

288.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

289.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

290.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 used—or, were integral participants to or failed to intervene in—unreasonable and excessive force against Plaintiff OURANIA THIMMHARDY, in violation of Article I § 13 of the California Constitution.

291.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, in violation of Article I § 13 of the California Constitution.

292.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

293.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

294.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

## SEVENTH CLAIM

### Unreasonable Post-Arrest Care

### (Cal. Const. Art. I § 13)

295.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

296.    The allegations of the preceding paragraphs 1 to 258 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

297.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 inadequately supervised, monitored, and responded to Plaintiff OURANIA THIMMHARDY, putting her at substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, in violation of Article I § 13 of the California Constitution.

298.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, in violation of Article I § 13 of the California Constitution.

299.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the

53

1  acts and omissions of employees acting within the scope of employment, including Defendants JIM

2  COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

3      300.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and

4  DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

5      301.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of

6  Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT,

7  JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and

8  inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF

9  SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER,

10  MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against

11  Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

12      WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

13                              **EIGHTH CLAIM**

14                       **Tom Bane Civil Rights Act**

15                      **(Cal. Civ. Code § 52.1)**

16      302.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY

17  OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER,

18  MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

19      303.    The allegations of the preceding paragraphs 1 to 301 are realleged and incorporated, to the

20  extent relevant, as if fully set forth in this Claim.

21                              Excessive Force

22      304.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4,

23  and DOE 5 used—or, were integral participants to or failed to intervene in—unreasonable and excessive

24  force against Plaintiff OURANIA THIMMHARDY, with deliberate indifference and/or reckless

25  disregard to rights protected by the Fourth Amendment to the United States Constitution; and Article I §

26  13 of the California Constitution.

27      305.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO,

28  SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or

                                      54

customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, with deliberate indifference and/or reckless disregard to rights protected by the Fourth Amendment to the United States Constitution; and Article I § 13 of the California Constitution.

Unreasonable Post-Arrest Care

306.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 inadequately supervised, monitored, and responded to Plaintiff OURANIA THIMMHARDY, putting her at substantial risk of suffering serious harm, without taking reasonable available measures to abate that risk, where a reasonable official in the circumstances would have appreciated the high degree of risk involved, with deliberate indifference and/or reckless disregard to rights protected by the Fourth Amendment to the United States Constitution; and Article I § 13 of the California Constitution.

307.    *Municipal / Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, with deliberate indifference and/or reckless disregard to rights protected by the Fourth Amendment to the United States Constitution; and Article I § 13 of the California Constitution.

Retaliation

308.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, and DOE 3 retaliated against Plaintiff OURANIA THIMMHARDY for engaging in constitutionally protected activity with intent to inhibit that activity, with deliberate indifference and/or reckless disregard to rights protected by the First Amendment to the United States Constitution; and Article I §§ 1, 2, 3 of the California Constitution.

Title II of the Americans With Disabilities Act, § 504 of the Rehabilitation Act

309.    *Vicarious Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 failed reasonably to accommodate Plaintiff OURANIA THIMMHARDY's disability, where a reasonable accommodation was available, including by, *inter alia*, refraining from retaliation and using excessive force against Plaintiff OURANIA THIMMHARDY; timely summoning medical care for Plaintiff OURANIA THIMMHARDY; transporting Plaintiff OURANIA THIMMHARDY to a hospital or facility that could provide necessary medical care or treatment; and/or timely responding to Plaintiff

55

OURANIA THIMMHARDY based on an immediate medical need, with deliberate indifference and/or reckless disregard to rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; and Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

310.    *Municipal /Supervisory Liability*: Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, and JIM COOPER maintained policies or customs of action and inaction resulting in harm to Plaintiff OURANIA THIMMHARDY, with deliberate indifference and/or reckless disregard to rights protected by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; and Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

\*   \*   \*

(Allegations Common To Each Theory)

311.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

312.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

313.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and treble damages and civil penalties against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

\ \ \

\ \ \

56

## NINTH CLAIM

### Assault / Battery

314.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

315.    The allegations of the preceding paragraphs 1 to 245 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

316.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 used—or, were integral participants to, failed to intervene in, and/or aided-and-abetted— unreasonable and excessive force against Plaintiff OURANIA THIMMHARDY.

317.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

318.    Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

319.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

## TENTH CLAIM

### Intentional Infliction of Emotional Distress

320.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, MATTHEW GURICH,

57

DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

321.    The allegations of the preceding paragraphs 1 to 319 are realleged and incorporated, to the extent relevant and as if fully set forth in this Claim.

322.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 engaged in outrageous conduct—including, *inter alia*, excessive force, unreasonable post-arrest care, retaliation, and disability discrimination in violation of the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, and/or national and local standards—with intent or reckless disregard of the probability that Plaintiff OURANIA THIMMHARDY would suffer emotional distress and she did suffer severe emotional distress.

323.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

324.    Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

325.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory and nominal damages against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

### ELEVENTH CLAIM

#### Negligence

326.    Plaintiff OURANIA THIMMHARDY asserts this Claim against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER,

MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

327.    The allegations of the preceding paragraphs 1 to 325 are realleged and incorporated, to the extent relevant, as if fully set forth in this Claim.

328.    *Individual Liability*: Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5 owed Plaintiff OURANIA THIMMHARDY a duty of care and breached a duty by, including, *inter alia*, excessive force, unreasonable post-arrest care, retaliation, and disability discrimination in violation of the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

329.    *Supervisory Liability*: Defendant JIM COOPER owed Plaintiff OURANIA THIMMHARDY a duty of care—including (a) through Defendant JIM COOPER's own conduct in creating or increasing an unreasonable risk of harm to Plaintiff OURANIA THIMMHARDY; (b) through Defendant JIM COOPER's special relationships (employer-employee) with Defendants MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and/or (c) through Defendant JIM COOPER's special relationships (public protection and/or jailer-prisoner) with, and affirmative duty to protect, Plaintiff OURANIA THIMMHARDY—and breached that duty including by maintaining policies or customs of action and inaction which resulted in harm to Plaintiff OURANIA THIMMHARDY in violation of the United States and California Constitutions, federal and state laws, regulations, policies, standards, general orders, procedures, training, national and local standards, and/or California Civil Code § 1714(a).

330.    *Vicarious Liability*: Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT are vicariously liable, through the principles of *respondeat superior* and pursuant to California Government Code § 815.2(a), for injuries proximately caused by the acts and omissions of employees acting within the scope of employment, including Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

331.    Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions constituted oppression, fraud, and/or malice resulting in great harm.

332.    Plaintiff OURANIA THIMMHARDY was injured as a direct and proximate result of

59

Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5's actions and inactions, entitling her to receive compensatory damages against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5; and punitive damages against Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5.

WHEREFORE, Plaintiff OURANIA THIMMHARDY prays for relief as hereunder appears.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff OURANIA THIMMHARDY seeks Judgment as follows:

1.  For an award of compensatory, general, special, and nominal damages (including under federal and state law) against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5, according to proof at trial;

2.  For an award of exemplary/punitive damages against Defendants JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions, as alleged, were motivated by evil motive or intent, involved reckless or callous indifference to constitutionally and statutorily protected rights, or were wantonly or oppressively done, and/or constituted oppression and/or malice resulting in great harm;

3.  For an award of actual damages, treble damages, punitive damages, civil penalties, and any other available relief against Defendants COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, JIM COOPER, MATTHEW GURICH, DOE 1, DOE 2, DOE 3, DOE 4, and DOE 5, pursuant to California Civil Code §§ 52, 52.1, and any other statute as may be applicable (except that no punitive damages are sought against Defendants COUNTY OF SACRAMENTO and SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, pursuant to California Civil Code § 818);

4.  For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794, 42 U.S.C. § 12205, California Civil Code § 52.1, California Code of Civil Procedure

60

§ 1021.5, and any other statute as may be applicable;

      5.      For interest; and

      6.      For an award of any other further relief, as the Court deems fair, just, and equitable.

Dated: May 30, 2025                    Respectfully Submitted,

By: _____

    Mark E. Merin
    Paul H. Masuhara
    LAW OFFICE OF MARK E. MERIN
    1010 F Street, Suite 300
    Sacramento, California 95814
    Telephone: (916) 443-6911
    Facsimile: (916) 447-8336

    Attorneys for Plaintiff
    OURANIA THIMMHARDY

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiff OURANIA THIMMHARDY.

Dated: May 30, 2025

Respectfully Submitted,

By: _____
Mark E. Merin
Paul H. Masuhara
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone: (916) 443-6911
Facsimile: (916) 447-8336

Attorneys for Plaintiff
OURANIA THIMMHARDY

62